<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                  :
ROBERT S. VISINTINE,              :
                                  :   Civil Action No. 11-4678 (RMB)
              Plaintiff,          :
                                  :
        v.                        :          **OPINION**
                                  :
DONNA ZICKEFOOSE, et al.,         :
                                  :
              Defendants.         :
_____:

**BUMB**, District Judge:

     After three years of litigation and ninety-five docket
entries, this matter, ripe for resolution of Defendants' motion
for summary judgment, warrants a careful sorting-out.

     For the reasons detailed below, Defendants' motion will be
denied as to four of Plaintiff's claims and granted as to the
remainder of his many challenges.  Two of these surviving claims
(related to the FCI Fairton) will be severed into their own, new
and separate matter, and Plaintiff will be directed to re-plead
them with the required degree of specificity, provided that he
expressly accepts his financial responsibility for litigating
those claims and identifies the appropriate defendants.  With
regard to the two surviving claims remaining in the instant
matter (related to the FCI Fort Dix), Plaintiff will be directed
to identify the appropriate defendants and detail and aver to the
factual predicates underlying these claims.

## I.    BACKGROUND

On August 15, 2011, the Clerk received Plaintiff's pleading styled as a § 2241 habeas petition, wherein Plaintiff, a federal inmate then confined at the FCI Fort Dix ("Fort Dix"), asserted "Human Rights Abuse, Eighth Amend[ment] Cruel and Unusual Punishment [by] Denied medication, deliberate indifference, torture mental cruelty; [and being] Imprisoned in violation of 5th, 6th[] and 8th Ame[n]d[ments of] U.S. Const[itution]." Docket Entry No. 1, at 3 (capitalization and lack thereof, as well as punctuation and lack thereof, in original).  In support of that claim, Plaintiff alleged that: (a) he was denied medications prior to his entry of a guilty plea; (b) after his conviction, he had to consume those medications on an empty stomach; (c) that mode of medicating caused him side effects; and (d) the Fort Dix warden did not intervene in that mode of medicating.  In addition, he asserted: (a) his displeasure with his housing arrangements (since the Fort Dix cells, designed for eight inmates, housed, allegedly, up to twelve inmates); (b) his exposure to second-hand smoking and concerns with the possibility of becoming sick as a result of being exposed to unidentified bacteria/viruses; and (c) his unhappiness with the prison officers' mode of interaction with the inmates, poor keep of the prison facilities, violence among inmates, etc.  See id. at 3-5.

While Plaintiff's allegations, concerns and statements of displeasure did not call for emergent judicial intervention, his claim that he "has been denied his psychiatric medication for 6 months and . . . has not been seen by the medical health staff" for the same period of time, id. at 5, read jointly with his application for temporary injunctive relief, see id. Docket Entry No. 1-2, cautioned that a prompt judicial intervention might have been necessary.  Therefore, this Court: (a) liberally construed Plaintiff's pleading as a civil complaint raising conditions of confinement claims under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971); (b) directed the Clerk to terminate the original habeas action and to commence the instant civil matter; (c) granted Plaintiff conditional in forma pauperis status to litigate his civil claims; and (e) directed the Fort Dix warden (i.e., the sole respondent named in the original habeas petition and, thus, the sole entity over whom this Court had immediate in personam jurisdiction) to show cause as to why a preliminary injunction should not issue.  See Docket Entry No. 6.[1]

_____

[1] Although Plaintiff's claim as to denial of medication prior to his entry of guilty plea (and the effect on his capacity to plead guilty) read as a habeas claim, it did not warrant a continuation of his § 2241 action.  His submission indicated that he was convicted in the United States District Court for the Southern District of Ohio in 1992.  See Docket Entry No. 1, at 2. Thus, his attack on his guilty plea, if intended, had to be raised almost twenty years prior to his commencement of his § 2241 action in this District: by an appeal to the Sixth Circuit

The warden duly complied.  <u>See</u> Docket Entry No. 10.  Her
response and the attached record indicated that Plaintiff had
arrived to Fort Dix on January 27, 2009, and, just forty eight
hours later, was evaluated by the prison's Health Services
psychologist.  During that evaluation, Plaintiff was found
psychologically stable and, upon the doctor's notice that
Plaintiff suffered of bipolar disorder and had been taking three
mental health medications, all in pill form, he was prescribed
the very same pills, as well as further psychiatric consultations
on a periodic basis.  The next day he had an evaluation for
chronic care and stated to the evaluating physician that he felt
"great."

More than four months passed by, during which Plaintiff was
offered and took his mental health pills: always prior to
breakfast.  On June 2, 2009, he had an evaluation by a
psychiatrist.  During that evaluation, he verified he was doing
fine, taking his pills timely and experiencing no side effects.

Another eight months passed by.  On February 2, 2010, he had
another evaluation, this time at the Mental Health Clinic.
Again, he reported proper consumption of his pills (that were

---

or, if he could show cause and prejudice, or fundamental
miscarriage of justice, by a § 2255 motion to the Southern
District of Ohio.  It light of this time-line and venues, it was
apparent that Plaintiff utilized a § 2241 form in error.

dispensed to – and consumed by – him prior to breakfast) and stated that he had no complaints, concerns or side effects.

Another seven months passed by.  On September 1, 2010, Plaintiff had another Mental Health Clinic evaluation.  Once again, he stated he was duly taking the pills (dispensed to him prior to breakfast) with no complaints, concerns or side effects.

Two and a half months passed after the September 2010 evaluation.  On November 16, 2010, after taking his mental health pills prior to breakfast for twenty one months, Plaintiff informed his chronic care physician that he stopped taking one of those pills because, allegedly, it made him nauseous and sweaty if consumed prior to breakfast.  The physician referred him to the Health Services for these nausea and sweating complaints.[2]

Another five months passed by.  In April 2011, while receiving counseling from a pharmacist, Plaintiff stated that he had not been taking any of his mental health pills since November 2010.  The pharmacist informed Plaintiff's doctors of that statement, and Plaintiff was called for a visit with his chronic care physician.  During that visit, Plaintiff confirmed that he was not taking any mental health pills for six months or so.  He

---

[2]  At that point, Plaintiff was recommended to consume the food he was purchasing at the prison's commissary either with or prior to his pills.  He responded that he had no funds for such food purchases.  However, his commissary records at the time revealed large amounts of food purchases.

asserted that all his mental health pills had started to make him feel nauseous and began to cause him vomiting unless he could consume food prior to or with those pills.

Since that statement suggested that Plaintiff might have had developed certain side effects triggered by his consumption of pills on an empty stomach, the chronic care doctor offered Plaintiff the opportunity to have his time slot changed from the pre-breakfast period to the at-dinner time.  That way, the pills would necessarily be consumed by Plaintiff after both breakfast and lunch (rather than on an empty stomach) and, in addition, his consumption of pills would be followed by a dinner meal.

Plaintiff, however, refused the doctor's offer and stated that he was willing to consume his pills only before going to bed i.e., at 8:00 p.m. or later.[3]  To justify his demand, Plaintiff asserted that, even if taken with food, all his mental health pills made him feel "tired" and so he wished to ensure that his consumption of pills would not interfere or negatively affect his ability to enjoy his evening hours.[4]

---

[3]  Plaintiff's willingness to have his pills administered at 8:00 p.m. or later, that is, *many hours* after dinner and *without* any prison-served food, gave additional credence to the doctor's conclusion that Plaintiff's alleged side effects were triggered by his consumption of pills on an empty stomach, i.e., when the pills were entering his system after a prolonged nightly fasting.

[4]  Under the Fort Dix regulations, prescription medications must be distributed to inmates only during scheduled times slots and should be consumed in front of a designated detail to ensure

In light of Plaintiff's express refusal to have his mental health pills dispensed to him at dinner time, the pills remained dispensed to him during the original pre-breakfast period. More than a year passed by, during which Plaintiff was offered his pills at the original pre-breakfast hour.[5]

On June 23, 2011, a pharmacist visited Plaintiff, who was housed in the Special Housing Unit ("SHU"). Upon Plaintiff's statement that he was firm in his decision to refuse any further mental health medication unless his pills were dispensed to him at his preferred hour of 8:00 p.m. or later, the pharmacist finally discontinued Plaintiff's medication.

Three weeks later, Plaintiff filed his § 2241 petition noted at the outset of this Opinion, i.e., the pleading asserting that he was denied his mental health pills for six months and that he was not seen by any medical staff for the same period of time. The warden, however, responded that "[t]he only denial of medical care [Plaintiff experienced] was self-imposed." Id. at 2.

---

the inmates' proper compliance with prescriptions and to prevent abuse of medications. At Fort Dix, there are two time slots during which inmates obtain and consume their prescription medications: one is prior to breakfast, while the other starts at 5 p.m. and ends at or about 5:45 p.m., i.e., just minutes before the inmates are called for dinner.

[5] There is no clarity, either in the record or in Plaintiff's submissions, as to whether he was taking his pills during that year or refusing to take the pills, or was taking the pills on some days but refusing to take them on the others.

Plaintiff filed an affidavit conceding that he was refusing to take his mental health pills because they were not dispensed to him at his preferred hour but raised two new, alternative allegations, i.e.: (a) that, during the time he was at the SHU, he experienced an unspecified "serious gastrointestinal problems" and was left unsatisfied with the medication he received; and (b) that, on another date, he had unspecified "great pain and discomfort" and was denied any medication. See Docket Entry No. 11.

Then, Plaintiff filed four follow-up statements. The first qualified the Fort Dix warden as "Nazi" and Plaintiff as a "Jew in a death camp," and – while repeating his claim that he was denied his pills – simultaneously conceded that the pills were indeed available to him, albeit not at his preferred hour of 8:00 p.m.[6] See Docket Entry No. 14.

The second statement alleged that Plaintiff's mental health pills were expressly "prescribed" for his consumption at 8:00 p.m. or later. See Docket Entry No. 15. The third statement requested a stay of this matter because of Plaintiff's transfer to FCI Fairton ("Fairton"). See Docket Entries Nos. 17, 22.

---

[6] To harmonize his claim and his concession, Plaintiff alleged that the pills should have been deemed "constructively denied" to him since they were not offered to him after 5:45 p.m.

Once at Fairton, Plaintiff filed his fourth statement, this time seeking an injunction against the Fairton warden: he alleged that Fairton inmates had to use pre-printed "sender's address" labels on their outgoing mail, and he perceived that rule as a violation of his civil rights.   See Docket Entry No. 23.[7]

After filing those four statements, Plaintiff filed his first amended complaint.   See Docket Entry No. 25.  He recited his above-detailed claims and added new ones, alleging that: (a) the Fort Dix warden conspired to violate his "Human Rights"; (b) the Fort Dix warden denied him Percocet, a medication generally not distributed in prisons due to its addictive properties; (c) the Fort Dix warden denied him "medical treatment for two fractures around the eye socket"; (e) the Fort Dix warden denied him removal of some stitches; (f) the Fort Dix warden denied him "medical treatment for [two] gastrointestinal disorder[s]"; (g) Plaintiff was the subject of "a false incident report" that yielded unspecified disciplinary sanctions; and (e) Plaintiff lost his employ at Fort Dix upon being transferred to a medium-

_____

[7]   At that point, this Court — to ensure against litigation of duplicative claims — directed consolidation of this matter with Plaintiff's other action raising a panoply of challenges to his confinement at Fort Dix, since some claims raised in that other matter overlapped with the issues raised in the instant matter.   See Docket Entry No. 18.  Because these two matters were deemed duplicative and consolidated, Plaintiff was not assessed a filing fee in connection with that other action.   See infra, this Opinion, n. 17 (further addressing the filing fee issue).

security facility.[8]  See id. at 3, 6-7; see also Docket Entry No.
28 (Plaintiff's second amended complaint substantively analogous
to the first one).[9]  In addition to the above-listed mix of
challenges, the amended complaint also recited Plaintiff's claims
that his rights were violated by Fort Dix housing up to twelve
inmates in the cells designed for eight inmates.  Plaintiff
supplemented that claim with other claims: (a) the fact that Fort
Dix inmates could, on occasion, wait up to four hours for their
medical appointments; (b) the overall depreciation of the Fort
Dix facilities, which caused the floor tiles to "break[] and
crack[]"; and (c) Plaintiff being assaulted by a certain inmate
on May 23, 2011, etc.[10]  Id. at 4.

Plaintiff's amended complaint also contained allegations
relating to Fairton.  It asserted that the Fairton warden

_____

[8]  It appears that one of the disciplinary sanctions was
Plaintiff's transfer from Fort Dix to Fairton, a medium-security
facility.  See http://www.bop.gov/locations/institutions/fai.

[9]  No statement in Plaintiff's submissions detailed how the
warden of Fort Dix was implicated in the alleged events, hence
suggesting that Plaintiff kept referring to the warden solely on
the basis of her official capacity as the Fort Dix administrator.

[10]  Thus, while the raised-in-the-amended-complaint claim
that Plaintiff suffered certain fractures did not clarify how
those fractures came about and maintained that he was denied
medical care for those fractures, the other statements in the
amended complaint shed light on the former (by asserting that
Plaintiff was attacked by another inmate on May 23, 2011) and
contradicted the latter: by stating that Plaintiff had stitches
around those fractures, hence indicating that he had surgery.

violated his rights by: (a) denying him "medical treatment for
[an unspecified] knee injury and [unspecified] skin sores"; (b)
installing washers/dryers that allowed private laundry services
but required a payment; (c) housing almost twice the amount of
inmates Fairton was designed to house; and (d) providing Fairton
inmates with "inadequate laundry services." See id. at 6.[11]

Plaintiff's latest amended complaint named only two
Defendants: the Fort Dix warden and Officer Boyce ("Boyce"), a
prison official who, allegedly participated in Plaintiff's
disciplinary hearing.  However, because the body of the latest
amended complaint contained no mention of Boyce and insisted that
the Fort Dox warden was "personally responsible" for all
Plaintiff's alleged injuries, the Court dismissed his
unarticulated claims against Boyce without prejudice and directed

_____

[11]   Plaintiff's first amended complaint sought "immediate
and unconditional release" and $1,668,000 in damages.  See Docket
Entry No. 28, at 8.  However, release from confinement is not a
remedy available in civil matter: such remedy must be pursued in
a habeas matter raising timely and valid claims to an inmate's
sentence (or calculation of that sentence).  See Preiser v.
Rodriguez, 411 U.S. 475 (1973); Leamer v. Fauver, 288 F.3d 532,
540 (3d Cir. 2002).  One's displeasure with his conditions of
confinement cannot warrant habeas relief.  See Ali v. Gibson, 572
F.2d 971, 975, n.8 (3d Cir. 1978) (an attack on "conditions of
confinement" is cognizable in a federal habeas action only in
"extreme cases," e.g., placement in a wrong prison) (citations
omitted); accord Aamer v. Obama, 742 F.3d 1023, 1036 (D.C. Cir.
2014) (same, citing, inter alia, Woodall v. Fed. Bureau of
Prisons, 432 F.3d 235, 242 & n.5 (3d Cir. 2005), which addressed
denial of transfer to a community correctional center); Ganim v.
Fed. Bureau of Prisons, 2007 U.S. App. LEXIS 12483, at *3-5 (3d
Cir. 2007) (detailing the approach adopted in the Third Circuit).

the Fort Dix warden to respond to Plaintiff's allegations.  <u>See</u>
Docket Entries Nos. 26 and 27.

   The Fort Dix warden moved for dismissal or, in the
alternative, for summary judgment, arguing that: (a) she was not
personally involved in any events alleged by Plaintiff; and (b)
in her official/supervisory capacities, she was not amenable to a
<u>Bivens</u> suit for damages.  <u>See</u> Docket Entry No. 35, at 3 (citing
<u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009)).  The warden's motion
also argued that Plaintiff's challenges based on the alleged
denial of medical care were subject to dismissal for failure to
state a constitutional claim, even if those challenges were
construed as claims raised against prison officers personally
involved in the alleged events.[12]  <u>See</u> <u>id.</u> at 8-12 (citing
<u>Hartman v. Corr. Medical Serv.</u>, 366 F. App'x 453, 455 (3d Cir.
2010).  Opposing that motion, Plaintiff asserted that the warden

_____

   [12]  The warden's motion reiterated that Plaintiff's alleged
"denial" of mental health pills was self-imposed, that he was
given Ranitidine for both incidents of acid reflux, that Percocet
was medically substituted by a mixture of Tylenol and codeine
because of Percocet's addictive properties, that Plaintiff's
orbital fractures were surgically treated, that his stitches were
removed on June 9, 2011, that an optometrist examined his vision
and found no disorder, that Plaintiff removed the remaining
suture himself, without waiting for a medical professional to
perform the removal, etc.  <u>See</u> <u>generally</u>, Docket Entry No. 35.
The warden also noted that Plaintiff's conditions of confinement
claims were facially defective.  <u>See</u> <u>id.</u> at 12-22.  She also
contended that Plaintiff's due process rights were neither
violated by his disciplinary hearing nor implicated by his
transfer to Fairton.  <u>See</u> <u>id.</u> at 23-24.

"had personal and intimate involvement in denying [Plaintiff's

mental health pills] as prescribed" since she signed a response

to Plaintiff's administrative grievance wherein he complained

about his inability to be medicated at his preferred hour of 8:00

p.m. or later.[13]  Docket Entry No. 38.

In light of that statement and this Court's prior <u>sua</u> <u>sponte</u>

screening of Plaintiff's claims, the Court denied Defendants'

hybrid motion and directed the filing of an answer.[14]  <u>See</u> Docket

_____

[13]  For a reason not entirely clear to this Court, Plaintiff
then moved for default judgment, <u>see</u> Docket Entries Nos. 44 and
46, and followed that application by other motions, such as: (a)
a third motion to amend, <u>see</u> Docket Entry No. 52 (adding Boyce
and Lt. Kaough ("Kaough") as defendants in light of their
involvement in the disciplinary hearing Plaintiff referred to in
his amended complaint); (b) a motion to "produce," <u>see</u> Docket
Entry No. 53; (c) a motion for "stipulations," <u>see</u> Docket Entry
No. 54; (d) a motion for "admissions," <u>see</u> Docket Entry No. 56;
(e) a demand for judgment as to his motion for default judgment,
<u>see</u> Docket Entry No. 58; and (f) a fourth motion to amend.  <u>See</u>
Docket Entry No. 61.  After this Court granted Plaintiff's motion
to re-amend his pleadings once again, <u>see</u> Docket Entry No. 67,
Plaintiff filed a complaint substantively indistinguishable from
his many preceding  pleadings, although – this time – he named
Fort Dix warden, Boyce and Kaough as defendants.  <u>See</u> Docket
Entry No. 68.

[14]  Since the standards applicable to a <u>sua</u> <u>sponte</u> review
and a Rule 12(b) motion are substantively identical, a Rule 12(b)
motion is ill suited to challenge a pleading proceeded past the
<u>sua</u> <u>sponte</u> dismissal stage.  <u>See</u> <u>Aruanno v. Green</u>, 527 F. App'x
145, 147 (3d Cir. 2013).  And while a summary judgment motion is
well suited to challenge a plaintiff's claim if the defendant
relies on the record not made part and parcel of the plaintiff's
pleading, <u>see</u> <u>In re FleetBoston Fin. Corp. Sec. Litig.</u>, 2007 U.S.
Dist. LEXIS 87425, at *80-81, n. 31 (D.N.J. Nov. 28, 2007), in a
<u>pro</u> <u>se</u> action, a summary judgment argument is poorly suited for
a pre-answer hybrid motion unless that motion expressly notifies
the <u>pro</u> <u>se</u> litigant of the consequences of his failure to respond

Entries Nos. 39 and 40.  Defendants duly complied, <u>see</u> Docket

Entry No. 41, and followed their answer by a motion for summary

judgment, <u>see</u> Docket Entry No. 87, which Plaintiff, now housed at

the Medical Center in Butner, <u>see</u> Docket Entries Nos. 91 and 95,

opposed.[15]  <u>See</u> Docket Entry No. 90.

## II.  EFFECT OF RULES OF CIVIL PROCEDURE 18 AND 20

At its earliest stage, this matter warranted consolidation

with Plaintiff's other action.  As of now, however, Plaintiff's

allegations have mushroomed into a <u>de</u> <u>facto</u> diary.  Therefore,

they obligate this Court to conduct an analysis under Rules 18

and 20 of the Federal Rules of Civil Procedure.

Rule 20 limits the joinder of defendants, while Rule 18

limits the joinder of claims.[16]  Paramount here, Rule 20 provides

---

to the summary judgment argument with his affidavits.  <u>See</u>
<u>Renchenski v. Williams</u>, 622 F.3d 315, 340-41 (3d Cir. 2010)
(citing <u>Lewis v. Faulkner</u>, 689 F.2d 100, 101 (7th Cir. 1982)).

[15]  Plaintiff opposition read jointly with the statements
made in his prior filings.  <u>See</u> <u>Love v. N.J. Dep't of Corr.</u>, 2011
U.S. Dist. LEXIS 10102, at *105 (D.N.J. Jan. 31, 2011) (citing
<u>Jackson v. Broad. Music, Inc.</u>, 2006 U.S. Dist. LEXIS 3960, at *18
(S.D.N.Y. Jan. 31, 2006), for the observation that "the court may
take judicial notice of admissions in pleadings filed by a party
that contradict the party's factual assertions in a subsequent
stage")(brackets, ellipses and citation omitted).

[16]  Rule 18 (a) provides that "[a plaintiff] may join . . .
as many claims as it has against an opposing party."  Fed. R.
Civ. P. 18(a).  Wright & Miller's treatise on federal civil
procedure explains that, where multiple defendants are named, the
analysis under Rule 20 precedes that under Rule 18.  <u>See</u>
Charles Allen Wright, et al., 7 <u>Federal Practice & Procedure</u>
<u>Civil</u> § 1655 (3d ed. 1997 & 2010).

that "[p]ersons . . . may be joined in one action as defendants

[only] if . . . any right to relief is asserted against them . .

. aris[es] out of the same transaction . . . or series of

[interrelated] transactions." Fed. R. Civ. P. 20(a)(2)(A) and

(B). This principle applies to all legal actions, including

those brought by inmates, even if they are proceeding <u>pro</u> <u>se</u>.

> [M]ultiple claims against a single party are fine, but
> Claim A against Defendant 1 should not be joined with
> unrelated Claim B against Defendant 2. Unrelated
> claims against different defendants belong in different
> suits, not only to prevent the sort of morass that [a
> multi]-claim, [multi]-defendant suit produce[s] but
> also to ensure that prisoners pay the required filing
> fees . . . . A buckshot complaint that would be
> rejected if filed by a free person - say, a suit
> complaining that A defrauded the plaintiff, B defamed
> him, C punched him, D failed to pay a debt, and E
> infringed his copyright, all in different transactions
> - should be rejected if filed by a prisoner.

<u>George v. Smith</u>, 507 F. 3d 605, 607 (7th Cir. 2007).

Since Plaintiff has injected claims based on his Fairton

confinement into the instant matter, his allegations violate both

Rule 20 and Rule 18. Thus, this action will be reserved for his

unresolved claims related to Fort Dix, while his unresolved

claims related to his confinement at Fairton will be severed into

a new and separate action. Those Fairton claims will be deemed

timely, since they were raised within Plaintiff's limitations

period.[17]

---

[17] Plaintiff will be directed to verify his willingness to
assume his financial responsibility for litigating those claims.

III. SUMMARY JUDGMENT STANDARD APPLICABLE TO FORT DIX CLAIMS

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Carrasca v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.[18]  See Anderson v. Liberty Lobby, Inc., 477

---

This is so because Plaintiff was not assessed a filing fee in connection with the matter consolidated with the instant action, i.e., Visintine v. Federal B.O.P. ("Visintine-II"), Civil Action No. 11-4927 (RMB), and, therefore, he cannot have his Fairton claims reverted to the Visintine-II index.  See Izquierdo v. State, 2013 U.S. App. LEXIS 15533, at *2-3 and n.1 (3d Cir. July 25, 2013) (a court cannot conclusively rule on the merits of a claim litigated in its own indexed matter if the filing fee issue was not resolved in that matter); compare Thomas v. Christie, 2011 U.S. Dist. LEXIS 91244, at *18-19 and n.11 (D.N.J. Aug. 15, 2011) (if a litigant obtains in forma pauperis status for the purposes of a claims raised in a matter that was later consolidated, that claim may be severed and reverted back to the original matter, since the filing fee issue was resolved).  Plaintiff's legal obligation to prepay the filing fee or to duly obtain in forma pauperis status in connection with his Fairton claims has been incurred upon him raising those  claims.  See Hairston v. Gronolsky, 2009 U.S. App. LEXIS 22770, at *5 (3d Cir. Oct. 15, 2009) (citing Hall v. Stone, 170 F.3d 706, 707 (7th Cir. 1999)).  Plaintiff in entitled to decline prosecution of his Fairton claims (and assessment of the filing fee in connection with prosecution of those claims) in the event he elects to withdraw his Fairton claims that survive the instant review.

    [18]  Thus, "[i]f the motion does not establish the absence of a genuine factual issue, the district court should deny summary

U.S. 242, 248 (1986).  The court should not decline to grant summary judgment on the basis of mere allegations or denials in the pleadings: instead, evidence must be produced to support each material fact.  See Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).[19]

_____

judgment even if no opposing evidentiary matter is presented." Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006).

[19] This is so because, "[i]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).  Too illustrate, a moving party is obligated to meet "the burden of supporting [its] motion[] 'with credible evidence . . . that would entitle [that party] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("[T]he moving party . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party") (emphasis removed, internal citations omitted).  Once the moving party has satisfied its burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  See Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  Hence, the party opposing the motion for summary judgment cannot just rest on it allegations and must present actual evidence that creates a genuine issue as to a material fact for trial.  See Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

**IV.  CLAIMS AGAINST NAMED DEFENDANTS**

The Fort Dix warden cannot be sued in this matter if all Plaintiff's claims, be they raised initially or injected at a later stage, are seeking damages and based on her official and/or supervisory capacities, i.e., her employ as the head of the Fort Dix administration.  Plaintiff maintains that the warden had to be deemed personally implicated in the alleged events because she signed a response to Plaintiff's grievance seeking distribution of his pills at 8:00 p.m. or later.  That fact, however, is insufficient to personally implicate the warden.  See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Nami v. Fauver, 82 F.3d 63 (3d Cir. 1996); Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993).[20]

---

[20]  Even under Spruill, Nami, and Durmer, allegations by the prisoner who filed a grievance with his warden (complaining about deficiencies of his medical care) fail to state a cognizable claim unless he asserts that he was denied any medical care, and the warden, being informed of such blanket denial of care: (a) failed to act; and (b) did it in a fashion displaying deliberate indifference  See Junne v. Atl. City Med. Ctr., 2008 U.S. Dist. LEXIS 34147, at *39-45 (D.N.J. Apr. 25, 2008) (discussing the same at length and quoting Durmer, 991 F.2d at 69 n.14, for the observation that no supervising prison officer "is a physician," and that supervising officer cannot "be considered deliberately indifferent simply because [he/she] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"); see also Jackson v. Grondolsky, 2013 U.S. Dist. LEXIS 91591, at *11 (D.N.J. June 30, 2013) (same).  In other words,

> [i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable

Accordingly, the Fort Dix warden's motion for summary judgment will be granted, and all Plaintiff's claims against her will be dismissed.  Plaintiff's claims against Boyce and Kaough, except for the challenges related to his disciplinary hearing, will also be dismissed forthwith since Plaintiff's filings unambiguously indicate that these Defendants were involved only in that disciplinary hearing and not implicated in any other event alleged.  See Iqbal, 556 U.S. 662.[21]

## V.    MEDICAL CLAIMS BASED ON PLAINTIFF'S FORT DIX CONFINEMENT

### A.    Substantive Test Governing Medical Care Claims

---

hands.  This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.  Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

Spruill, 372 F.3d at 236.   Here, the record shows that Plaintiff was provided with medical care, although it became not to his liking starting September 2010.   However, Plaintiff's displeasure with the care he was receiving cannot be equated with absence of care envisioned in Spruill-Nami-Durmer.

[21]  Also, as Defendants correctly pointed out, the Fort Dix warden, Boyce and Kaough cannot be sued on the basis of Plaintiff's allegations based on his confinement at Fairton since it is apparent from the volumes of Plaintiff's submissions that these three Defendants have no connection to Fairton whatsoever.

Plaintiff has a protected right in being incarcerated at a place of confinement confirming to the standards set forth by the Eighth Amendment.  The Constitution "does not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349 (1981), but it does not permit inhumane ones.  See Helling v. McKinney, 509 U.S. 25, 31 (1993).  Thus, the Eighth Amendment prohibition of cruel and unusual punishment "imposes duties on [prison] officials, who must . . . take *reasonable* measures to guarantee the [life, health and] safety of the inmates."  Hudson v. Palmer, 468 U.S. 517, 526-527 (1984) (emphasis supplied); see also Helling, 509 U.S. at 31-32; Washington v. Harper, 494 U.S. 210, 225 (1990); Estelle v. Gamble, 429 U.S. 97, 103 (1976).

To prevail on a medical care claim under the Eighth Amendment, a litigant must show that the defendants were: (a) deliberately indifferent to (b) his serious medical needs.  See Estelle, 429 U.S. 97; see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).[22]

---

[22]   A prolonged severe pain qualifies as a serious medical need; and a medical need is also serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth Cty Corr. Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).  "Deliberate indifference" exists where a prison official knows of a prisoner's need for medical treatment but intentionally refuses to provide it.  See Rouse, 182 F.3d at 197.  Also, deliberately delaying necessary medical diagnosis for a long period of time in order to avoid providing care constitutes deliberate indifference that is actionable.  See

Neither inconsistencies nor differences in medical
diagnoses, or refusal to consider inmate's preferences can amount
to cruel and unusual punishment.  See White v. Napoleon, 897 F.2d
103 (3d Cir. 1990); Pilkey v. Lappin, 2006 U.S. Dist. LEXIS 44418
(D.N.J. June 26, 2006) ("Plaintiff's dissatisfaction with the
promptness and frequency of treatment, since it [was] not as
speedy or as relentless as Plaintiff desire[d,] . . . fail[s] to
state a claim upon which a relief may be granted") (citations
omitted); Alsina-Ortiz v. Laboy, 400 F.3d 77 (1st Cir. 2005) (a
doctor's failure to respond to certain request for services by
the inmate, in context of the doctor's continued and regular
services, did not deprive the inmate of any meaningful
treatment); see also Patterson v. Lilley, 2003 U.S. Dist. LEXIS
11097 (S.D.N.Y. June 20, 2003) (defendants could only be held
deliberately indifferent to an existing serious medical
condition, not a speculative future medical injury); Jones v.
Lockhart, 484 F.2d 1192 (8th Cir. 1973) (allegations of mere
differences of opinion over matters of medical judgment fail to
state a federal constitutional question).

> [W]hile Plaintiff appears to be of opinion that he was
> sentenced to imprisonment so the BOP would keep
> performing full medical examinations of Plaintiff "from

---

Durmer, 991 F.2d 64.  In addition, deliberate indifference is
evident where officials erect arbitrary and burdensome procedures
that result in interminable delays/denials of medical care to
suffering inmates.  See Lanzaro, 834 F.2d at 346-47.

21

head to toe" and to have a doctor at Plaintiff's
disposal around the clock in order to detect every
current and future Plaintiff's medical need and provide
Plaintiff with every treatment Plaintiff may wish for
or fancy, the Eighth Amendment does not envision such a
right.  See Hudson v. McMillian, 503 U.S. 1, 9 (1992)
("Society does not expect that prisoners will have
unqualified access to health care") . . . .

Pilkey, 2006 U.S. Dist. LEXIS 44418, at *37.

    **B.**   **The Time of the Day When the Pills Were Dispensed**

Plaintiff's core medical claim related to Fort Dix is two-
pronged.  First, he asserts that, shortly after September 2010,
he began developing side effects upon consuming either one or all
of his pills on an empty stomach.  As to the second prong, he
claims that, regardless of whether he was taking his pills on an
empty stomach, he was becoming less agile after taking his pills
and, thus, could not fully enjoy his evening hours unless the
pills were dispensed to him at 8:00 p.m. or later.[23]  Appended to
this second prong is Plaintiff's mentioning that his pills were
"prescribed" to him for consumption at 8:00 p.m. or later.  Both
prongs of Plaintiff's claim are unavailing.

While Defendants are correct in their observation that
Plaintiff could have eliminated the alleged side effects of his

---

[23]    Since it is undisputed that during his Fort Dix
confinement Plaintiff never agreed to take his medications at
dinner time, and Plaintiff concedes that his alleged side effects
developed during his Fort Dix confinement, Plaintiff's claim that
he would not be able to fully enjoy his evening hours had he
taken his pills at dinner time is purely speculative.

pre-breakfast medications had he rationed a small portion of the food he purchased at the commissary for consumption with his pills, Plaintiff's right to have his medical needs addressed cannot turn on his ability or inability to purchase food.[24]  That said, Plaintiff did, indeed, have his medical needs addressed (in the sense that the Fort Dix prison officials took measures to alleviate Plaintiff's side effects).  They did so when they offered Plaintiff to change his medicating time slot from pre-breakfast to dinner.  Since Defendants' record clearly establishes, and Plaintiff concedes, that he declined this opportunity, the Fort Dix officials were not deliberately indifferent to Plaintiff's medical needs.  Plaintiff's mere displeasure cannot be converted into a claim of constitutional magnitude.  See Pilkey, 2006 U.S. Dist. LEXIS 44418, at *37.

The same applies to the second prong of Plaintiff's claim. While the side effects Plaintiff allegedly experienced upon consuming his pills on an empty stomach could, arguendo, qualify as serious medical needs under Estelle and Lanzaro, his inability to fully enjoy his evening hours cannot qualify as a "serious" medical need or a "medical need" of any kind.  The prison

---

[24]  Since inmates are necessarily presumed unable to fend for themselves, see Hudson, 468 U.S. at 526-527; accord Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997), prison officials' obligation to address Plaintiff's side effects cannot be affected by the food the prison did not supply to him or by the funds he had during a certain period of time to purchase commissary food.

officials' election not to disrupt Fort Dix's operations (by
instituting a third, post-dinner, medicating time slot prison-
wide to cater to Plaintiff's preferences) cannot qualify as
deliberate indifference.  See Rodriguez v. Lilienthal, 1993 U.S.
App. LEXIS 34109 (9th Cir. Dec. 21, 1993).

In Rodriguez, the initial prison operation was such that all
inmates were receiving their evening medications at 8:30 p.m.
However, when the facility expanded and the staff had to give
medications to additional hundred patients, the evening
medication schedule was changed to accommodate the increase, and
the inmates began receiving their medications between 6:30 p.m.
and 7:30 p.m.  One inmate, who was prescribed an antidepressant,
raised an Eighth Amendment claim alleging that being medicated
earlier in the evening caused him to wake up in the middle of the
night and/or have nightmares.  The district court presumed,
arguendo, that his sleep disruption could qualify as a serious
medical need but nonetheless granted summary judgment to the
prison officers.  The Ninth Circuit affirmed, explaining:

> We recognize [the inmate's] serious medical needs but
> agree with the district court that [the prison
> officers] did not treat those needs with deliberate
> indifference.  We must afford prison officials great
> deference in executing policies that are necessary to
> preserve internal order. . . .  Recognizing the
> institutional concerns of having to dispense
> medications to hundreds of inmates each night, we must
> conclude that [the prison officers'] role in imposing
> the new schedule does not amount to cruel and unusual
> punishment, especially in light of the evidence that

24

> the therapeutic value of [the inmate's antidepressant]
> was not reduced by this change [in schedule].
> Furthermore, at most [the inmate and the prison
> officers] have a difference of opinion as to the
> appropriate scheduling of drug distribution and his
> medical care, which is not actionable. . . . [The
> inmate] received his medication nightly, and the
> therapeutic effect was not diminished by the earlier
> time schedule.

Rodriquez, 1993 U.S. App. LEXIS 34109, at *11-14 (citing Whitley

v. Albers, 475 U.S. 312, 321-22 (1986); Bell v. Wolfish, 441 U.S.

520, 547 (1979)).

This Court finds the rationale of Rodriquez persuasive.  The

same institutional concerns are present here.  Fort Dix houses

close to five thousand inmates, see http://www.bop.gov/

locations/institutions/ftd.  No statement in Plaintiff's record

or his submissions suggests that his pills were differently

effective in controlling his mental illness if they were consumed

prior to breakfast or at the dinner time.[25]  Thus, Defendants

will be granted summary judgment as to both prongs of Plaintiff's

claim, i.e., that he was denied a treatment for his side effects

and that he could not have his pills dispensed to him at 8:00

p.m. or later.

_____

[25]  Accord Evans v. Bonner, 196 F. Supp. 2d 252 (E.D.N.Y.
2002) (dismissing an inmate's claim challenging the timing of his
medications since the overall effectiveness of his medications
was not affected by the fact that the medications were
administered to him at a different time, even though the inmate
believed that the timing had to be important because his
prescription included a recommended time for medicating).

The sole aspect warranting further review is Plaintiff's vague "hinting" that the pills were medically *prescribed* to him with an express directive to be taken at or after 8:00 p.m., and that directive had an actual medical significance in terms of the effectiveness of these pills.[26]  See id.; see also Evans, 196 F. Supp. 2d 252.  Although Plaintiff's hints to that effect are "insufficient to repel summary judgment" in Defendants' favor, Schoch, 912 F.2d at 657, this Court is not in a position to grant Defendants summary judgment.  Defendants must meet their "burden of supporting [their] motion[] 'with credible evidence.'"  In re Bressman, 327 F.3d at 237; see also Celotex, 477 U.S. at 331. Hence, this Court's determination as to this narrow aspect will be reserved until the parties flesh it out.  See Bressman, 327 F.3d at 237; Lacey, 772 F.2d at 1109.[27]

---

[26]  In the event Plaintiff was actually prescribed to take his pills at 8:00 p.m. or later, that prescription had to be obeyed, unless it was changed by a medical practitioner on the basis of medical reasons.  See Rodriguez, 1993 U.S. App. LEXIS 34109, at *11-14; see also Lanzaro, 834 F.2d at 346 (deliberate indifference is demonstrated "[w]hen . . . prison authorities prevent an inmate from receiving *recommended* treatment for serious medical needs") (emphasis supplied); accord Inmates of Allegheny Cty Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) ("Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.  Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made") (internal quotation and citation omitted).

[27]  This Court, therefore, will: (a) direct the Clerk to add "Unspecified Medical Practitioners at Fort Dix" as Defendants in

C.   **Other Medical Claims**

There are three other medical care challenges raised in connection with Plaintiff's Fort Dix confinement.  Specifically, during the pendency of this action, he injected the following claims into this litigation: (a) that his Percocet prescription was unduly changed to Tylenol with codeine; (b) that he was not treated for gastrointestinal disorders he allegedly experienced on May 26, 2011, and on August 21, 2011; and (c) that he was denied treatment for his orbital fractures (and, simultaneously, that he was denied removal of stitches that resulted from a surgical treatment of those very fractures).  Defendants are entitled to summary judgment on each of these three claims.

---

this matter; (b) direct Plaintiff to execute an affidavit detailing his facts, if any, showing that his pills were *medically prescribed* for his consumption at 8:00 p.m. or after, and to identify the personnel at Fort Dix advised of *that* medical prescription; and (c) allow the so-identified Defendants to move for summary judgment by addressing Plaintiff's affidavit.  If Plaintiff's affidavit fails to detail his *facts*, such motion for summary judgment will be granted upon Defendants' averment that Plaintiff's prison record contains no such prescription.  See Anderson, 477 U.S. at 248; Siegel, 54 F.3d at 1130-31 (3d Cir. 1995); Schoch, 912 F.2d at 657; cf. United States v. Napolitan, 2014 U.S. App. LEXIS 15112 (3d Cir. Aug. 6, 2014) (the court should not "essentially require the [party] to prove a negative"); Lupyan v. Corinthian Colleges, Inc., 2014 U.S. App. LEXIS 15019, at *16-17 (3d Cir. Aug. 5, 2014) ("where [a party is] forced to prove a negative[,] the law has long recognized that such an evidentiary feat is next to impossible") (citing Piedmont and Arlington Life-Ins. Co. v. Ewing, 92 U.S. 377, 380 (1875), for the observation that "[w]hile it may be easy enough to prove the affirmative of a question, it is next to impossible to prove the negative") (brackets omitted).

### 1.   Treatment with a Substitute to Percocet

Here, the record indicates that Plaintiff's Percocet prescription was medically substituted in light of Percocet's addictive properties, and the substituting mixture had a similar health benefit without any measurable risk of addiction.

Plaintiff's displeasure with that substitution does not state a viable claim.  See DeBoer v. Luy, 70 F. App's 880 (7th Cir. 2003).  The record before this Court shows that Plaintiff's Percocet prescription was changed so to avail him to relief from pain while guarding him against a risk of addiction.  Such medical change in prescription reflected a difference in medical opinions which cannot be second-guessed by this Court.  See White v. Napoleon, 897 F.2d at 110 ("[N]o claim is stated when a doctor disagrees with the professional judgment of another doctor").  Thus, Defendants' motion for summary judgment will be granted as to Plaintiff's Percocet-based claim.

### 2.   Treatment of Gastrointestinal Disorders

Plaintiff's second claim is based on two gastrointestinal disorders that allegedly caused him either a "severe/great pain" or mere "discomfort."  Regardless of how these claims are construed, Defendants are entitled to a finding in their favor.

If this Court were to focus on Plaintiff's qualification of his gastrointestinal disorders as "discomfort," his claims are subject to dismissal as pled.  A "discomfort" cannot qualify as a

"serious medical need."  See, e.g., Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996) (a prison medical staff's refusal to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not violate the Constitution"); Williams v. Williams, 2006 U.S. Dist. LEXIS 15008 (S.D. Ohio, Mar. 31, 2006) (mild pains do not amount to a "severe medical need"); accord Turner v. Dallas Cty Jail, 2006 U.S. Dist. LEXIS 34567 (N.D. Tex. 2006) (an inmate's dizziness and brief diarrhea was not a serious medical condition); compare Alexander v. Coughlin, 1991 U.S. Dist. LEXIS 10661 (E.D.N.Y. July 26, 1991) (prisoner's diarrhea constituted a sufficiently serious medical need because he experienced "severe abdominal pains" for two days).

Alternatively, if Plaintiff suffered a "great/severe pain" as a result of his gastrointestinal disorders, Defendants are entitled to summary judgment since the record shows that, on both occasions, Plaintiff was indeed treated: with Ranitidine.[28]  See Nabatanzi v. New Hampshire Dep't of Corrections, 2000 U.S. Dist. LEXIS 16309 (D.N.H. 2000); see also Cress v. Dalmasi, 2014 U.S. Dist. LEXIS 62925 (E.D. Pa. May 5, 2014) (same, where an inmate

---

[28]  "Ranitidine is used to treat ulcers; gastroesophageal reflux disease, a condition in which backward flow of acid from the stomach causes heartburn and injury of the food pipe; and conditions where the stomach produces too much acid . . . ." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html.

stated he had symptoms suggesting a gastrointestinal disorder and was treated with Ranitidine).

While Plaintiff's filings elaborate on his displeasure with the treatment he received, such displeasure cannot alter this Court's analysis.  See Napoleon, 897 F.2d at 110; see also Hasty v. Johnson, 103 F. App'x 816 (5th Cir. 2004) (prisoner failed to state a claim for deliberate indifference when he alleged that medical personnel provided him with purportedly less efficacious drugs for gastroesophageal reflux disease: the decisive fact was that he received "a" treatment); accord Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970) (a difference of opinion between physician and patient did not sustain a claim under § 1983); Goff v. Bechtold, 632 F. Supp. 697 (S.D. W. Va. 1986) (denial of preferred course of treatment does not infringe constitutional rights); accord Lopez v. Kruegar, 1990 U.S. Dist. LEXIS 6808 (E.D. Pa. June 4, 1990) (where plaintiff stated that he was receiving medication but felt that additional medical tests should have been taken, his allegations were directed at the wisdom or quality of treatment and, thus, did not state a claim); Coleman v. Crisp, 444 F. Supp. 31 (W.D. Okla. 1977) (difference of opinion between plaintiff and doctors concerning availability of treatment and medication cannot establish a violation of constitutional rights).  Thus, Defendants' motion for summary

30

judgment will be granted as to Plaintiff's allegations based on his gastrointestinal disorders.

### 3.   Treatment of Plaintiff's Orbital Fracture

Plaintiff's third medical care claim is two-pronged, and these prongs contradict each other.  On the one hand, he alleges that he had his eye socket fractured and never received any medical treatment for the fractures; on the other hand, he concedes that the fractures were surgically treated but maintains that his rights were violated because the stitches were never removed.

The record provided by Defendants verifies that Plaintiff's first allegation is facially false since, right after the injury, he had a surgical procedure treating the fractures.  The record also shows that Plaintiff's use of the word "stitches" was unwarranted, in the sense that his "stitches" were timely removed, and his eye was evaluated by a medical specialist after that removal.  The sole fact upon which Plaintiff builds – and which Defendants do not dispute – is that Plaintiff removed the *remaining sutures* himself, without waiting for a medical practitioner to do the task.  That fact, however, cannot avoid summary judgment in Defendants' favor, regardless of whether Plaintiff's sutures were absorbable or non-absorbable.[29]

_____

[29]   Absorbable sutures rapidly break down in the tissues.  <u>See</u> http://www.emedicinehealth.com/removing_stitches/article_

31

Even if this Court presumes the latter, Plaintiff's allegations suggest at most a brief delay in removal of his sutures and his election not to wait for removal by a medical professional.  Nothing in the record suggests that Plaintiff requested but was denied removal of his residual sutures, or that the sutures – during the period when they were remaining in his body – became ingrown and caused him pain or injury.  Thus, while such delay could, potentially, qualify as negligence, negligence is not actionable in a <u>Bivens</u> matter.  <u>See</u> <u>DeJesus v. Corr. Med. Servs.</u>, 2014 U.S. App. LEXIS 14557, at *10-11 (3d Cir. July 30, 2014) ("When distilled to their core, [the plaintiff's claim] sound[s] in negligence or malpractice . . . .  Claims of negligence or medical malpractice do not constitute deliberate indifference") (citing <u>Rouse</u>, 182 F.3d at 197); <u>see</u> <u>also</u> <u>Church v. Hegstrom</u>, 416 F.2d 449 (2d Cir. 1969) (stating, thirty-five years prior to <u>DeJesus</u>, that, "§ 1983 . . . does not authorize federal courts to interfere in the ordinary medical practices or other matters of internal discipline of state prisons") (citing <u>Monroe v. Pape</u>, 365 U.S. 167 (1961)).  Therefore, Plaintiff's claims alleging denial of treatment to his fracture(s) or failure to remove his stitches will be dismissed.

---

em.htm.

D.   **Quasi-Medical Claims**

In addition to the above-detailed four medical care claims, Plaintiff also raised three claims triggering the same legal analysis.  Specifically, Plaintiff: (a) alleged his concerns with the possibility of contracting unspecified bacteria/viruses; (b) expressed displeasure with the fact that inmates occasionally waited up to four hours for their medical appointments; and (c) alleged an unspecified exposure to second-hand smoking.

1.   **Bacteria and Viruses**

The first line of these quasi-medical challenges warrants dismissal since Plaintiff stated merely his hypothetical concerns with being potentially exposed to an unspecified harm.  See Brooks v. City of Pine Knot, 2009 U.S. Dist. LEXIS 97870, at *15 (E.D. Ky. Oct. 21, 2009) (mere speculations that the inmate might have been exposed to and contracted swine flu are subject to dismissal); Betancourt v. San Francisco Sheriff's Dep't, 2008 U.S. Dist. LEXIS 103325, at *9 (N.D. Cal. Dec. 22, 2008) (where an inmate asserted that his blanket might have been "infested" with a virus but offered no evidence, beyond his own speculation, he failed to state a viable claim); see also Dawson v. Frias, 2010 U.S. Dist. LEXIS 30513 at *8 (D.N.J. Mar. 30, 2010) ("speculation as to what might or might not happen in the future" cannot serve as a basis for a valid claim) (citing Rouse v. Pauliilo, 2006 U.S. Dist. LEXIS 17225 (D.N.J. Apr. 5, 2006)

33

(dismissing speculative claim as to hypothetical future events
and citing <u>Kirby v. Siegelman</u>, 195 F.3d 1285 (11th Cir. 1999));
<u>Pilkey</u>, 2006 U.S. Dist. LEXIS 44418, at *45 ("Plaintiff's
[anxieties] fail to state a claim upon which relief may be
granted"); <u>Patterson</u>, 2003 U.S. Dist. LEXIS 11097 (defendants
could only be found liable to violations ensuing from an existing
condition, not to a speculative future injury).[30]

Defendants, therefore, will be granted summary judgment as
to this purely speculative claim.

---

[30] Moreover, even if this Court were to read Plaintiff's
abstract speculations jointly with his factual assertion that he
suffered gastrointestinal disorders on two different days, his
claims are still subject to dismissal since no fact offered to
this Court connects Fort Dix officials to the unknown cause of
these alleged disorders.  <u>See</u> <u>Nelson v. McGrain</u>, 2013 U.S. Dist.
LEXIS 151921, at *7 (W.D.N.Y. Oct. 22, 2013) (citing <u>Livingston
v. Goord</u>, 225 F. Supp. 2d 321, 332-33 (W.D.N.Y. 2002), <u>rev'd on
other grounds</u>, 153 F. App'x 769 (2d Cir. 2005), for the
observation that summary judgment to defendants is warranted when
an inmate claims that his meals were infected because, "even
assuming that the food was contaminated by someone, it would . .
. be speculative to conclude that these defendants were the
culprits simply because they delivered plaintiff's food to him");
<u>Petway v. City of New York</u>, 2012 U.S. Dist. LEXIS 83540, at *24
(E.D.N.Y. June 14, 2012) (granting summary judgment to law
enforcement officers when an inmate alleged that he was exposed
to "all kinds of pathogens" in a "dirty cell" and became
"violently ill" with some "never identified" bacterial infection,
since the inmate's allegations were speculative and unsupported
by the record which contained no evidence that his "unidentified
infection" was caused by the defendants or by his incarceration,
or that his conditions of confinement otherwise fell below
"contemporary standards of decency") (citations omitted).

**2.   Wait Time for Medical Appointments**

Plaintiff's claim asserting that his rights were violated because the inmates at Fort Dix had to wait, on occasion, up to four hours for their medical appointments is deficient both jurisdictionally and substantively.

To the extent Plaintiff asserts a claim on the basis of the waiting time experienced by *other* inmates, he is without standing to raise that claim.  See Whitmore v. Arkansas, 495 U.S. 149, 154 (1990) (setting forth the jus tertii requirement); see also Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 103, n.5 (1998) ("the point [is] whether a plaintiff 'personally would benefit in a tangible way from the court's intervention'") (quoting Warth v. Seldin, 422 U.S. 490, 508 (1975)).  To the extent he asserts that he had to wait up to four hours for his appointments on some unspecified occasions, such claim fails to allege deliberate indifference on the part of Fort Dix medical personnel.

While an intentional delay in diagnosis or treatment might violate an inmate's constitutional rights, see Durmer, 991 F.2d at 68 and n.9 (where an inmate suffered two strokes that caused his leg to drag and weakness in his arm, and then he had another stroke, but the doctor effectively denied him physical therapy for months, until the effects of stroke became irreversible, the doctor acted with deliberate indifference), the inquiry turns on

the relation between the seriousness of injury at issue and the promptness of medical care.  Compare Douglas v. Lanier, 2013 U.S. Dist. LEXIS 129515 (M.D. Pa. Sept. 11, 2013) (where an inmate asserted that he had to wait hours until medical staff treated his urinary retention problem, the allegation of such delays was insufficient to show deliberate indifference even though the inmate claimed that he was in great pain while he waited for his treatment), and Ferguson v. Cape Girardeau Cty, 883 F. Supp. 431 (E.D. Mo. 1995) (where an inmate was denied treatment for eight hours after he requested medical assistance for chest pains, his allegations failed to state a viable claim even though he insisted he was in great pain), to Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014) (a prisoner's rights were violated when he suffered a heart attack, but the prison officers merely stated that he wished to "see what happens," which statement caused another inmate to checked the prisoner's pulse, and upon finding none, begin to perform CPR, while the prisoner – after briefly regaining conscious – had another heart attack and died), and Hancock v. Leong, 2014 U.S. Dist. LEXIS 49305 (E.D. Cal. Apr. 9, 2014) (where a prisoner suffered an excruciating pain as a result of a severe spine injury and lost any ability to move, prison officers were deliberately indifferent to his serious medical needs when they made him wait eight hours to be seen by medical staff, asserted that the prisoner was "faking it," ordered other

36

inmates to throw the prisoner down three feet on a cement floor and caused the prisoner to become permanently wheel-chaired).

In other words, while a claim of deliberate indifference does not require a showing of complete failure to provide care, it requires a showing of "undue suffering or the threat of tangible residual injury." Lanzaro, 834 F.2d at 346 (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir.1976)).  One's need to wait for a scheduled appointment does not subject an inmate to such suffering or injury.  See Pilkey, 2006 U.S. Dist. LEXIS 44418, at *37.[31]

---

[31]  Here, the record shows that Plaintiff's need for medical attention resulting from his orbital fracture(s) was promptly addressed.  Even if this Court were to read the silence in the record and the silence in Plaintiff's filings as suggesting that he might have had to wait up to four hours for treatment of his two gastrointestinal disorders, his need to wait a few hours for a treatment of that medical need could not implicate his constitutional rights.  See, e.g., Singletary v. Khune, 2014 U.S. Dist. LEXIS 72501 (W.D.N.C. May 28, 2014) (a few hour delay in treatment of diarrhea and acid reflux that were caused by an inmate's stomach erosion/ulcers); Heilman v. Lyons, 2013 U.S. Dist. LEXIS 99432, at *52 (E.D. Cal. July 15, 2013) ("While plaintiff is correct that a prolonged episode of gastroenteritis . . . could possibly put his life at risk, plaintiff presents no competent evidence that a one day, or even a three day, delay in treatment [could] put his life at risk"); accord Alster v. Goord, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (no Eighth Amendment violation where the prison staff first waited two days to take an inmate to hospital after he complained of abdominal pain and then failed to transport him to his follow-up hospital appointments).

Therefore, Defendants will be granted summary judgment with regard to Plaintiff's claim based on either his or other inmates' need to wait up to four hours for their medical appointments.

### 3.    Second-Hand Smoking

Plaintiff also asserted an unspecified exposure to second-hand smoking.  Neither Plaintiff's nor Defendants' filings allow this Court to determine the magnitude of that exposure.

To state a civil right claim based on involuntary exposure to environmental tobacco smoke ("ETS"), Plaintiff must show that: (a) "he himself [was] exposed to unreasonably high levels of ETS," Helling v. McKinney, 509 U.S. 25, 35 (1993); (b) "the risk of which he complains [was] not one that today's society chooses to tolerate," id. at 36; and (c) certain identified defendants were deliberately indifferent to the serious risk to Plaintiff's future health from such exposure.  See id. at 35-36; see also Ford v. Mercer C'ty Corr. Center, 171 F. App'x 416 (3d Cir. 2006); Atkinson v. Taylor, 316 F. 3d 257, 262 (3d Cir. 2003).

A handful of Plaintiff's passim statements made post-pleading suggest that either certain inmates or some officers at Fort Dix smoked cigars or cigarettes, and Plaintiff encountered those persons in various areas of Fort Dix.  So pled, Plaintiff's allegations cannot amount to a viable claim.  See Johnson v. Demico, 2011 U.S. Dist. LEXIS 59094, at *12-13 (D.N.J. June 1, 2011) (where an inmate merely asserted that one of the defendants

38

"walk[ed] around smoking cigars," the court had no basis to
conclude that the inmate's rights were violated).  That said, at
the summary judgment stage, these vague assertions cannot be
countered by Defendants' silence, since this Court's analysis
must turn on the specifics of Plaintiff's ETS exposure, that is,
if such exposure actually took place.  Compare, e.g., Helling,
509 U.S. at 35 (bunking with a cellmate who smoked five packs of
cigarettes per day exposed an inmate to an unreasonable risk of
future harm from ETS exposure), and Atkinson, 316 F.3d at 259 (a
prisoner claiming that he shared a cell with constant smokers for
many months stated a viable claim), with Richardson v. Spurlock,
260 F.3d 495, 498 (5th Cir. 2001) (an inmate's sitting near some
smokers "sometime" did not result in an unreasonable exposure to
ETS), and Pryor-El v. Kelly, 892 F. Supp. 261, 267 (D.D.C. 1995)
(dismissing an ETS claim in which the plaintiff alleged "only
that various unnamed inmates and prison officials smoke 'in the
TV room, games room, and the letter writing room'").[32]

_____

        [32]  Thus, to flesh out this issue, the Court will: (a)
direct the Clerk to add "Unspecified Prison Officers at Fort Dix"
as Defendants in this matter; (b) direct Plaintiff to execute an
affidavit detailing his facts, if any, about the instances and
the magnitude of his ETS exposure and to identify the prison
officers who, allegedly, were put on notice of – but remained
deliberately indifferent – to that exposure; and (c) allow the
so-identified Defendants to move for summary judgment as to the
ETS issue.  Accord supra, note 27 (in the event of Plaintiff's
failure to state his facts, Defendants would prevail upon
averring that the record contains no facts indicative of a
violation of Plaintiff's rights since Defendants are not

**VI.   NON-MEDICAL CLAIMS RELATED TO CONFINEMENT AT FORT DIX**

**A.   <u>Due Process and Conditions of Confinement Claims</u>**

In addition to raising the above-discussed four lines of medical and three lines of quasi-medical challenges, Plaintiff also raised – and, during the course of this litigation, injected: (a) three claims attacking Plaintiff's disciplinary proceeding and the consequences of his transfer to Fairton; and (b) three claims attacking Fort Dix conditions of confinement. These six claims are addressed below.

**1.   Due Process Claims**

a.   <u>Validity of the Administrative Finding</u>

On May 23, 2011, while being at the East Health Services medical facility, Plaintiff and another inmate had an argument that transformed into a physical altercation.  <u>See</u> Docket Entry No. 87-2, at 22.  On the basis of that incident, a disciplinary action was instituted against Plaintiff, and a hearing was held. Plaintiff testified during that hearing and asserted that he did not participate in the fight but was merely attacked by another inmate.

However, the hearing officer was offered a witness' testimony that *both* Plaintiff and that other inmate participated in the fight.  The hearing officer found the witness' testimony

――――――――――――――

obligated to prove a negative).

more credible and concluded that Plaintiff committed a
disciplinary infraction.  Plaintiff was sanctioned to one week of
administrative segregation, loss of 13 days of good-conduct
credit and one month of loss of certain privileges.  He appealed,
maintaining that the incident report underlying the hearing was
false.  That appeals was denied.[33]

Defendants contend that regardless of the veracity of the
report underlying Plaintiff's hearing, Plaintiff's claim for
damages are barred, as a matter of law.  See Edwards v. Balisok,
520 U.S. 641, 646-48 (1997), and Heck v. Humphrey, 512 U.S. 477
(1994)[34]  Although Plaintiff's claims have continually shifted,
it does appear that in addition to damages, Plaintiff also seeks
injunctive relief in the form of a curative hearing and/or
expungement.  See Docket Entry No. 87-2, at 23.  Such claims are
cognizable in a civil action since they do not offend the Heck-
Balisok doctrine.  See, e.g, Fain v. Morgan, 2007 U.S. App. LEXIS
27548, at *2-3 and n.1 (3d Cir. 2007) (an inmate's later-injected
claim, attacking the process of his hearing, was cognizable in a

---

[33]  No pleading, statement or affidavit filed by Plaintiff
in this action disputes that the hearing officer was presented
with the witness' testimony implicating Plaintiff in the fight.

[34]  Defendants are correct in their observation that, in the
event Plaintiff wished to seek restoration of his lost good-
conduct credits, such claim cannot be litigated in a Bivens
action.  See Preiser, 411 U.S. 475; Leamer, 288 F.3d at 540; see
also Muhammad v. Close, 540 U.S. 749, 750 (2004).

civil action, even though his original claim attacked only the *outcome* of that hearing and expressly sought damages, and the inmate maintained  that the outcome violated his due process rights because the hearing officer relied upon what the inmate qualified as "fabricated evidence").[35]

Plaintiff's allegations implicate a two-prong due process analysis:

> The due process protections implicated by a disciplinary hearing consist of two interrelated aspects: one is of a quasi-procedural nature, . . . the other is quasi-substantive.  While the procedural aspect ensues from the holding of <u>Wolff</u> [<u>v. McDonnell</u>, 418 U.S. 539 (1974)], the substantive one provides that the findings made by a disciplinary official could be deemed valid only if they are supported by *some evidence* in the record. [<u>See</u> <u>Superintendent v. Hill</u>, 472 U.S. 445, 454 (1985).]

<u>Harris v. Ricci</u>, 2014 U.S. Dist. LEXIS 42967, at *7 (D.N.J. Mar. 28, 2014) (emphasis supplied).[36]

---

[35]  <u>Cf.</u> <u>Williams v. Fed. Bureau of Prisons</u>, 85 F. App'x 299, 303 (3d Cir. 2004) (noting, without endorsement, the holding of <u>Paine v. Baker</u>, 595 F.2d 197, 201 (4th Cir.1979), that "[i]n certain limited circumstances a claim of constitutional magnitude is raised where a prisoner alleges . . . that information [was placed] in his file, . . . that the information [was] false, and. . . that it [was] relied upon [by a hearing officer] to a constitutionally significant degree").

[36]  "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." <u>Wolff</u>, 418 U.S. at 556.  Thus, a prisoner is entitled only to: (a) an impartial decision-maker; (b) twenty-four hour notice of the charges; (c) an opportunity to call witnesses/present documentary evidence; (d) assistance from a representative; and (e) a written decision as to the outcome and evidence relied upon.  <u>See</u> <u>Griffin v.</u>

The "some evidence" standard is not a demanding one since "the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." Hill, 472 U.S. at 456.  Thus: (a) the "some evidence" requirement is violated only when a disciplinary sanction is rendered without *any* factual basis; and (b) the judicial process of ascertaining whether the "some evidence" standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing the evidence."  Id. at 455-56; see also Denny v. Schultz, 708 F.3d 140, 144 (3d Cir. 2013) (applying Hill standard to a federal prisoner's due process

_____

Spratt, 969 F.2d 16, 19 (3d Cir. 1992).  Here, the record shows that Plaintiff had all those safeguards.  Moreover, in connection with this aspect, the Court notes Plaintiff's administrative appellate statement reading, "I was denied due process by not allowing in the camera video tapes to prove there was no June 2, 2011, interview."  Docket Entry No. 87-2, at 23.  Plaintiff's numerous administrative submissions and the multiple filings he made in this matter never clarified what "interview" he had in mind.  However, granted that the incident at issue took place on May 23, 2011, Plaintiff's disciplinary hearing took place on July 14, 2011, and the administrative decision was entered on July 21, 2011, see id. at 20-24, the unexplained June 2, 2011, "interview" could not have had any relation to Plaintiff's Griffin rights since no event of constitutional significance took place on that date.  Finally, even if this Court could hypothesize any relevance, Plaintiff's referral to the video tapes are unavailing since the prison officials cannot be faulted for being unable to produce a video tape of the "interview" that, according to Plaintiff himself, never took place.  See Stearns v. Williamson, 2013 U.S. Dist. LEXIS 170693 (D. Or. Dec. 3, 2013) (where an inmate challenged his disciplinary proceeding by asserting that "he was not permitted to produce [a] surveillance video tape," his claim was without merit because "Defendants cannot be liable for failing to produce evidence that did not exist").

challenges to prison disciplinary proceedings); Young v. Kann,
926 F.2d 1396, 1402-03 (3d Cir. 1991) (same).[37]

Thus, a hearing officer, if presented with contradicting
accounts of events, is entitled to make a good faith finding as
to which testimony is less – and which one is more – credible.
See, e.g., Cardona v. Lewisburg, 2014 U.S. App. LEXIS 696, at *9-
10 (3d Cir. 2014) (upholding a disciplinary finding that a prison
officer's testimony was more credible than that by the prisoner);
Johnson v. Williamson, 2009 U.S. App. LEXIS 24043 (3d Cir. 2009)
(same, as to a witness' testimony); accord Brown v. Recktenwald,
2013 U.S. App. LEXIS 24487, at *97-98 (3d Cir. 2013) ("The Hill
standard is minimal and does not require . . . weighing of the
evidence.  The relevant inquiry is whether there is any evidence
in the record that could support the conclusion reached by the
disciplinary [officer]") (citations and quotations omitted).

---

[37]  In other words, the "some evidence" standard is even
less exacting than the preponderance of the evidence standard,
since the former merely requires that the prison officer's
decision was not wholly arbitrary or not without *any* support in
the record.  See, e.g., Gaither v. Anderson, 236 F.3d 817, 819
(7th Cir. 2000) (citing Hill, 472 U.S. at 457); Chase v. Warden,
USP Terre Haute, 2010 U.S. Dist. LEXIS 78308 (S.D. Ind. Aug. 2,
2010) (same); accord Brown v. Fauver, 819 F.2d 395 (3d Cir.
1987); Gibbs v. King, 779 F.2d 1040, 1044 (5th Cir. 1986).  "A
fortiori, the 'some evidence' standard is many levels below the
'beyond the reasonable doubt' standard, and it surely *does not
require unanimity of evidence.*"  Cannon v. Schultz, 2010 U.S.
Dist. LEXIS 81587 (D.N.J. Aug. 10, 2010) (emphasis supplied).

Here, the parties are not in dispute that Plaintiff's hearing officer was provided with a witness' testimony implicating Plaintiff in the altercation and made a finding that this testimony was more credible than Plaintiff's account of events.  No fact offered by Plaintiff indicates that such finding was made in bad faith: all Plaintiff asserted was his displeasure with that finding.  Since Plaintiff's displeasure cannot qualify as a disputed material fact, and the record establishes that his disciplinary sanctions were properly based on "some evidence," Defendants are entitled to summary judgment on that issue.[38]  See Denny, 708 F.3d at 149 and n.4 (noting that only "evidence of de minimis probative value, i.e., [the] evidence that would faintly tend to make an inmate's guilt more probable [fail to] constitute 'some evidence' under this standard of review" and citing Zavaro v. Coughlin, 970 F.2d 1148, 1152-53 (2d Cir. 1992), where the court "conclud[ed] that prison guard statements that 'every inmate' participated in a riot were not plausible and thus could not constitute 'some evidence' of an inmate's participation when the inmate was one of a hundred inmates in a large mess hall").

       b.   <u>Transfer to a Medium-Security Facility</u>

---

[38]  Thus, to the extent this line of challenges might have personally implicated Defendants Boyce and Kaough, these Defendants will be granted summary judgment in their favor.

Plaintiff also challenged his transfer from Fort Dix ("[a] low security . . . institution with an adjacent minimum security . . . camp," see http://www.bop.gov/locations/institutions/ftd) to Fairton, a medium-security facility, and his corresponding change in classification from a "low-security" inmate to a "medium-security" prisoner.[39]  Plaintiff maintains that his rights were violated because his classification was raised, while Defendants maintain that Plaintiff had no due process right in remaining housed at a particular prison.  Defendants' position is correct to the extent that, under Meachum v. Fano, 427 U.S. 215, 224-25 (1976), inmates have no due process rights barring their transfer from low-to-medium-security or even from low-to-maximum-security, prison.  See Montanye v. Haymes, 427 U.S. 236, 242 (1976) ("As long as the . . . confinement to which the prisoner is subjected is within the sentence imposed upon him . . .

---

[39]  Fairton also contains "an adjacent minimum security satellite camp and a detention center."  See http://www.bop.gov/locations/institutions/fai.  Had Plaintiff been transferred to that minimum security satellite camp, his classification would not have been affected.  However, since the record before this Court is silent as to the exact housing arrangements Plaintiff had at Fairton, this Court presumes – without making a factual finding and solely in light of Plaintiff's allegations that his classification was changed to medium – that he was housed at the main Fairton facility having a medium-security classification.

. , the Due Process Clause does not . . . subject an inmate's [prison placement] to judicial oversight").[40]

Seemingly aware of the <u>Meachum</u> bar, Plaintiff looks at his claim from a different angle and maintains that his rights were violated because the transfer raised his "classification" level. However, this change is unavailing because it introduces a distinction without a difference. <u>See</u> <u>Moody v. Daggett</u>, 429 U.S. 78, 88 n.9 (1976) (prison classification is a matter delegated by Congress to the "full discretion" of federal prison officials under 18 U.S.C. § 4081; thus, challenges to an inmate's classification implicate "no legitimate statutory or constitutional entitlement sufficient to invoke due process"); <u>Levi v. Ebbert</u>, 2009 U.S. App. LEXIS 25928, at *2 (3d Cir. 2009) (same, relying on <u>Moody</u>); <u>Stringer v. Bureau of Prisons</u>, 2005 U.S. App. LEXIS 18074, at *5 (3d Cir. 2005) (same); <u>accord</u> <u>Wesson v. Atlantic Cty Jail Facility</u>, 2008 U.S. Dist. LEXIS 97475

---

[40] While an inmate's due process could be implicated by a transfer that necessarily entails "a quantum change in the level of custody," <u>Ganim</u>, 2007 U.S. App. LEXIS 12483, at *4-8, such "quantum change" could be triggered only by a *dramatic* difference in terms of confinement. <u>See</u> <u>id.</u> at *6-8 (citing <u>Woodall</u>, 432 F.3d at 242; <u>Pischke v. Litscher</u>, 178 F.3d 497 (7th Cir. 1999); and <u>United States v. Jalili</u>, 925 F.2d 889 (6th Cir. 1991), so to reflect on "many distinctions between a traditional correctional facility and a [community correctional center ("CCC"), since] at CCCs, unlike in prison, inmates may be eligible for . . . releases for daily work in the community, overnight and weekend passes, and long[] furloughs," and, thus, a "placement in a CCC [is] more than a simple transfer").

(D.N.J. Nov. 26, 2008) (an inmate has no liberty interest either in a particular place of confinement or in a particular custody level) (relying on Sandin v. Conner, 515 U.S. 472, 484-86 (1995)).   Therefore, Defendants will be granted summary judgment with regard to Plaintiff's claim regardless of whether it attacks his transfer to Fairton or the change in his classification.

c.   <u>Loss of Employ at Fort Dix</u>

Omitted from Defendants' motion remains Plaintiff's other claim deriving from his transfer to Fairton, <u>i.e.</u>, his allegation that – as a result of that transfer – Plaintiff lost his employment at Fort Dix.   While Defendants' motion is silent as to that issue, Defendants are entitled to judgment in their favor as a matter of law since Plaintiff's allegation, even if true and/or uncontested, fail to state a cognizable claim.   <u>See</u> <u>English v. PNC Bank</u>, 2007 U.S. App. LEXIS 4717, at *7 (3d Cir. 2007) ("When the plaintiff fails to make a showing sufficient to establish the existence of an element essential to her case, . . . summary judgment for the defendant is warranted") (citation and internal quotation marks omitted).

Plaintiff has no constitutional right in obtaining or retaining *any* prison employment, moreover an employment at a particular prison facility.   <u>See</u> <u>Mimms v. U.N.I.C.O.R.</u>, 2010 U.S. Dist. LEXIS 20389 (D.N.J. Mar. 8, 2010) (inmates have no right to employment), <u>aff'd</u>, 386 F. App'x 32 (3d Cir. 2010); <u>see</u> <u>also</u>

48

<u>Watson v. Sec'y Pa. Dep't of Corr.</u>, 2014 U.S. App. LEXIS 9832, at
*4 (3d Cir. May 28, 2014) ("Inmates do not have a . . . property
interest in their job assignments that would give rise to Due
Process Clause protection"); <u>Bulger v. United States Bureau of
Prisons</u>, 65 F.3d 48 (5th Cir. 1995) (same); <u>James v. Quinlan</u>, 866
F.2d 627 (3d Cir. 1989) (same).  Thus, this claim will be
dismissed with prejudice.

### 2.   Claims Related on Conditions of Confinement

In addition to the foregoing challenges, Plaintiff raised
three broad, albeit rather vaguely articulated, claims stating
his general displeasure with: (a) depreciation of Fort Dix and
the poor upkeep of its facilities; (b) the overcrowding at Fort
Dix resulting from the prison's need to house, allegedly, up to
three times the amount of inmates the prison is designed to
house; and (c) unspecified violence among the inmates.

### a.   <u>Poor Upkeep and Depreciation</u>

The Eighth Amendment proscription against cruel and unusual
punishment protects prisoners from inadequate conditions of
confinement.  To prevail on a conditions claim under the Eighth
Amendment, an inmate must establish both an objective and a
subjective component.  <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 298
(1991).  Under the objective component, he must show that the
conditions alleged, either alone or in combination, deprived him
of "the minimal civilized measure of life's necessities," such as

adequate food, clothing, shelter, sanitation, etc. See Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992). As is the case with medical care claims, this component requires that the alleged deprivation be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. See Hudson, 503 U.S. at 9. And, as is with medical care claims, the subjective component requires that the defendants have acted with "deliberate indifference," i.e., with a state of mind equivalent to a reckless disregard of a known risk of harm. See Farmer v. Brennan, 511 U.S. 825, 835 (1994). Here, Plaintiff's claims asserting depreciation, unmoored to a particular Defendant, prevent this Court from conducting a subjective component analysis. However, that part of the analysis need not be reached here, since Plaintiff's allegations fail the test posed by the objective component.

Plaintiff asserted that Fort Dix is in poor upkeep, that the floor tiles are cracking, that the ceilings leak and there are many other unpleasantries plaguing the environment. Such allegations, even if presumed true and assessed in toto, are insufficient to establish that he was "subjected to genuine privations and hardship." Hubbard v. Taylor, 538 F.3d 229, 235 (3d Cir. 2008) (applying an even more exacting conditions-of-confinement standard applicable to pretrial detainees); see, e.g., Graham v. Christie, 2010 U.S. Dist. LEXIS 111006 (D.N.J.

50

Oct. 18, 2010) (allegations of poor sanitation and upkeep, such
as "poor air circulation, poor quality drinking water, cold
showers, and leaking ceilings," even if true, fail to state a
claim of constitutional magnitude); Walters v. Berks Cty Prison,
2012 U.S. Dist. LEXIS 31652 (E.D. Pa. Mar. 9, 2012) (where the
plaintiff was "forced to eat and sleep directly next to a toilet
emitting unpleasant odors . . . , [in] the presence of mice and
insects, [and] his cell had cracks in the concrete floors and
walls, which also contained plaster debris and were painted with
lead, . . . [t]he conditions of the plaintiff's confinement . . .
, while harsh, [did] not . . . state a claim [of] constitutional
violation[]") (citations, brackets and ellipses omitted).
Accordingly, this line of claims will be dismissed for being
insufficient as pled or, in alternative, upon grant of summary
judgment to Defendants in light of the record they produced.

b.   Overcrowding

Plaintiff's allegations that Fort Dix houses up to three
times the amount of inmates it was designed to house does not
state a deprivation of constitutional magnitude.[41]   See Hubbard,

---

[41]  Plaintiff's allegations are factually false.  As of now,
Fort Dix houses 4,700 inmates, out of which 4,310 are housed at
the prison itself and 390 are housed at the satellite camp.  See
http://www.bop.gov/locations/institutions/ftd.  Since there are
4,310 inmates being housed at the facility designed for 3,200,
the actual overcrowding at Fort Dix is at the rate of 34.7%,
i.e., at about one-tenth of the 300% rate alleged by Plaintiff.

538 F.3d at 236; see also North v. White, 152 F. App'x 111, 113

(3d Cir. 2005) (per curiam) ("Double or triple-bunking cells,

alone, is not per se unconstitutional") (citing Union Cnty. Jail

Inmates v. DiBuono, 713 F.2d 984, 1000 (3d Cir. 1983)); Gibase v.

George W. Hill Corr. Facility, 2014 U.S. Dist. LEXIS 82086 (E.D.

Pa. June 13, 2014) ("[H]ousing multiple inmates in a cell does

not alone establish a constitutional violation"); accord Lynch v.

Sheahan, 1992 U.S. Dist. LEXIS 13858 (N.D. Ill. Sept. 11, 1992)

(absent showing that housing conditions were result of a punitive

intent, rather than overcrowding resulting from the need to house

inmates, the fact that, as a result of overcrowding, rats and

roaches crawled over the plaintiff, while he was sleeping on a

mattress on the floor, was insufficient to survive summary

judgment motion).[42]  Thus, this line of claims will also be

dismissed for being insufficient as pled or, in the alternative,

---

[42]    Compare Brown v. Plata, 131 S. Ct. 1910 (2011)
(requiring California to reduce prison overcrowding since the
inmates' living conditions had become "toxic" in the sense that
they resulted in the officers' virtual inability to identify the
inmates' needs or to provide the inmates with even "rudimentary
care" or "any kind of chronic care").  Here, in contrast, the
record demonstrates that Plaintiff's needs were identified within
just forty-eight hours from his arrival to Fort Dix and, during
his entire Fort Dix stay, he was availed to multi-faceted medical
care, periodic psychiatric evaluations and constant chronic care.

Defendants are entitled to summary judgment as to this claim.

See English, 2007 U.S. App. LEXIS 4717, at *7.[43]

c.   Violence Among Inmates

Plaintiff's third conditions of confinement claim is also articulated in generic terms: it merely asserts violence among the inmates.  While such generic claim is facially deficient, see Phillips v. Cty of Allegheny, 515 F.3d 224, 230-34 (3rd Cir. 2008) (a claim must "possess enough heft to show that the pleader is entitled to relief") (citation, quotation marks and brackets omitted), this Court, out of an abundance of caution, reads this

---

[43]   To the extent Plaintiff's allegations of overcrowding could be construed as an assertion that Plaintiff had an unduly limited square footage of living space and that such limitation affected his ability to exercise or have physical recreation, this construction would not salvage Plaintiff's claim.  While the denial of exercise or recreation may, under some circumstances, result in a violation of the Eighth Amendment, see Fantone v. Herbik, 2013 U.S. App. LEXIS 11811, at *9 (3d Cir. 2013) (citing Peterkin v. Jeffes, 855 F.2d 1021, 1031-33 (3d Cir. 1988)), a limitation not triggering "medical effects is not a substantial deprivation" for the purposes of the Eighth Amendment analysis. May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997).  In other words, the inmate must show that the denial of recreation was such that it caused injury to his ability to control his muscular functions or to maintain his range of physical motions.  See Cary v. Rose, 902 F.2d 37 (7th Cir. 1990) (where the inmates had room in their cells and hallways to run in place/perform calisthenics, their allegations could not amount to a constitutional claim); see also Ellis v. Crowe, 2009 U.S. Dist. LEXIS 125154, at *36 (E.D. La. Dec. 18, 2009) (denial of recreation claim should be dismissed since the inmate did not allege that he suffered a physical injury, such as muscle atrophy or loss of range of motion).  Here, Plaintiff's medical record is before this Court, and no part of that record contains his complaints about physical injury, muscle atrophy or loss of range of motion that could be connected to any lack of physical recreation).

assertion in conjunction with the discussed supra fact that
Plaintiff was assaulted by another inmate and suffered orbital
fracture(s).  However, even such joint reading cannot prevent
summary judgment in Defendants' favor, since the facts offered by
Defendant and undisputed by Plaintiff establish that he has no
claim of constitutional magnitude.

The Eighth Amendment's prohibition against the infliction of
cruel and unusual punishment has been interpreted to impose upon
prison officials a duty to take reasonable measures "to protect
prisoners from violence at the hands of other prisoners."
Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (quoting
Farmer v. Brennan, 511 U.S. 825, 833 (1994)) (internal citations
omitted).  However, not "every injury suffered by one prisoner at
the hands of another . . . translates into constitutional
liability for prison officials responsible for the victim's
safety."  Farmer, 511 U.S. at 834.  In other words, the plaintiff
must prove more than that he had a fight with another inmate and
got injured, see Shelton v. Bledsoe, 2012 U.S. Dist. LEXIS 153059
(M.D. Pa. Oct. 24, 2012), since mere negligent conduct by prison
officers that leads to serious injury of a prisoner by a prisoner
does not expose the officers to liability under § 1983 or Bivens.
See Davidson v. Cannon, 474 U.S. 344, 347-48 (1986); see also Cty
of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) ("[L]iability

for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

Rather, to establish a failure to protect, the plaintiff must show that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the [defendant-officer] was deliberately indifferent to that substantial risk . . . , and (3) the [defendant'd] deliberate indifference caused [the plaintiff's] harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012); see also Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).

Because deliberate indifference is a subjective standard, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Whetzel, 256 F.3d at 125.  Paramount here, a prison official's awareness of overall violence among the inmate or even violent propensities or history of violence of particular inmates does not supply an inference of deliberate indifference.  See, e.g., Bistrian, 696 F.3d at 371 (the "risk that an inmate with a history of violence might attack another inmate for an unknown reason" is too "speculative" to give rise to an inference of deliberate indifference); accord Schwartz v. Cty of Montgomery, 843 F. Supp. 962, 971 (E.D. Pa. 1994), aff'd, 37 F.3d 1488 (3d Cir. 1994) (officers' failure to observe institutional policies regarding the supervision of dangerous inmates constitutes negligence, which is not actionable

in a constitutional matter).  Thus, Plaintiff's: (a) generic
allegations of violence among the inmates are deficient as a
matter of law; while (b) supplemented by the fact of his injury
in the hands of another inmate, these allegations fail because
the record contains no facts suggesting that the Fort Dix
officials knew of the specific risk of Plaintiff's injury, and
not a single statement in Plaintiff's voluminous submissions
offered to this Court (or in his opposition to Defendants'
motion) put that conclusion in dispute.  Since Defendants cannot
be expected to prove a negative, see supra, this Opinion, note
27, Plaintiff's claim asserting violence among the inmates will
be dismissed.  See Napolitan, 2014 U.S. App. LEXIS 15112, at *26;
English, 2007 U.S. App. LEXIS 4717, at *7.

>    **B.**   **Residual and Consolidated Claims**

In addition to the multitude of claims discussed supra,
Plaintiff raised and injected in this matter (and asserted in the
consolidated action): (a) a claim based on his displeasure with
the mode of interactions between prison officers and inmates; (b)
a claim that the warden conspired with unknown individuals to
violate Plaintiff's Eighth Amendment rights; (c) an analogous
claim that Boyce conspired with Kaough to violate Plaintiff due
process rights; and (d) a claim that the warden violated
Plaintiff's rights under the Privacy Act, 5 U.S.C. § 552a.

>    **1.**   **Conspiracy Claims Against the Warden, Boyce and Kaough**

a.   The Particularity Requirement

In order to state a viable § 1983 conspiracy claim, a
plaintiff must allege conspiracy "with particularity," even
though a heightened pleading standard generally does not apply to
civil rights actions against individual defendants.  See Bieros
v. Nicola, 860 F. Supp. 223, 225 (E.D. Pa. 1994) (citing
Leatherman v. Tarrant County Narcotics Intelligence &
Coordination Unit, 507 U.S. 163, 168 (1993)).  In other words, to
plead conspiracy adequately, a plaintiff must set forth factual
allegations that detail the period of the conspiracy, the object
of the conspiracy and, especially, the actions of the alleged
conspirators took to achieve their goal.  See, e.g., Shearin v.
E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989),
abrogated on other grounds by Beck v. Prupis, 529 U.S. 494
(2000).  Furthermore, in light of Iqbal, Twombly and their
progeny, there must be "'enough factual matter . . . to suggest
that an agreement was made,' in other words, 'plausible grounds
to infer an agreement.'"  Great Western Mining & Mineral Co. v.
Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010) (quoting
Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

b.   Conspiracy Claim Against the Warden

Here, Plaintiff has failed to allege any facts that
plausibly suggest a meeting of the minds between the warden and
any other individual(s).  Plaintiff did not even identify these

individuals, leaving it to this Court's conjecture whom the
warden conspired with, the period of the conspiracy, the exact
object of the conspiracy, and the actions these alleged
conspirators took to achieve their insidious goal.  So pled,
Plaintiff's conspiracy claim against the warden is facially
deficient.  See Great Western Mining, 615 F.3d at 178; Shearin,
885 F.2d at 1166.   Being expressly advised by Defendants of that
deficiency and of Defendants' position that the claim was subject
to dismissal, see Docket Entry No. 87-1, at 25-26 (Defendants'
motion, citing Jones v. Maher, 131 F. App'x 813, 815 (3d Cir.
2005); and Budike v. PECO Energy, 2013 U.S. Dist. LEXIS 157416,
at *20 (E.D. Pa. 2012), for the observations that "broad and
conclusory" conspiracy claims and "[w]holly conclusory
allegations of a conspiracy that do not specify the parties
involved or the agreement at issue will not survive a motion to
dismiss"), Plaintiff elected not to respond.   Thus, Plaintiff's
conspiracy claim raised against the warden will be dismissed, and
Defendants will be granted summary judgment at to that claim.
Cf. English, 2007 U.S. App. LEXIS 4717, at *7; accord this
Opinion, note 27.

        c.   Conspiracy Claim Against Boyce and Kaough

Plaintiff's conspiracy allegations against Boyce and Kaough
fare no better.  While, as to that alleged conspiracy, Plaintiff
identified both participants and asserted that they conspired to

find him guilty of the disciplinary infraction discussed supra,
he did not clarify what "conspiratorial" actions were taken
toward that goal and whether there was "a meeting of the minds."
Rather, he invited this Court to infer the existence of
conspiracy from his disappointment with the outcome of his
disciplinary hearing and the facts that both Boyce and Kaough
participated in the disciplinary process.  The Court "decline[s]
that invitation."  Syblis v. AG of the United States, 2014 U.S.
App. LEXIS 15801, at *14 (3d Cir. Aug. 18, 2014); see Hart v.
Whalen, 2008 U.S. Dist. LEXIS 71960, at *14-15 (M.D. Pa. July 29,
2008) (the fact that the charge was filed/prosecuted
administratively cannot establish conspiracy amount the
participating officers) (relying on Wesley v. Dombrowski, 2004
U.S. Dist. LEXIS 11938, 2004 WL 1465650 *7 (E.D. Pa.); and
O'Connell v. Sobina, 2008 U.S. Dist. LEXIS 2467 (W.D. Pa.));
compare Allen v. Fla. Dep't of Corr., 2014 U.S. App. LEXIS 16119,
at *9-10 (11th Cir. Aug. 21, 2014) (finding that an inmate's
allegations of conspiracy were plausible under Iqbal where the
inmate "has not just alleged broadly that a conspiracy existed
between Defendants.  Instead, [the inmate] contend[ed]
specifically that . . . 'Sgt. Lambert's husband asked Officer
Canon and Sgt. Eldridge to do him a favor since they are friends
and hunting buddies' and to have [the inmate found guilty of an
infraction] in retaliation for filing a grievance against Sgt.

59

Lambert"). Thus, Defendants will also be granted a judgment in their favor as to this claim.[44]

### 2. Privacy Act Claims

Plaintiff also asserted that the warden violated the Privacy Act by disclosing his prison records and/or his medical records compiled during incarceration. Addressing that line of challenges, Defendants correctly pointed out that "the Privacy Act authorizes suits only against federal agencies, not individuals," Docket Entry No. 87-1, at 19-20 (citing Martinez v. BOP, 444 F.3d 620, 624 (D.C. Cir. 2006); Brown-Bey v. United States, 720 F.2d 467, 469 (7th Cir. 1983); Kates v. King, 2011 U.S. Dist. LEXIS 150246 (M.D. Pa. June 2, 2011); and Bartholomew v. Fed. Bureau of Prisons, 2008 U.S. Dist. LEXIS 72787 (M.D. Pa. Sept. 23, 2008)), and – to the extent Plaintiff's allegations could be liberally construed as a claim against the BOP rather than the warden – such claim would still be subject to dismissal

---

[44] Although Defendants' motion omitted to elaborate on the exact shortcomings of Plaintiff's conspiracy claim against Boyce and Kaough, the motion did expressly put Plaintiff on notice that Defendants were seeking dismissal of that claim on the grounds that it was pled with an insufficient degree of particularity and there were no genuine material facts in dispute as to the absence of any conspiratorial agreement. See Docket Entry No. 87-1, at 25-26. Since Plaintiff's opposition is wholly silent as to the issue, such silence: (a) indicates that Plaintiff has no material facts to dispute Defendants' position; and (b) warrants grant of summary judgment to Boyce and Kaough because these Defendants are not obligated to prove the negative. Cf. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d at 533; see also this Opinion, note 27.

since: (a) "the BOP has exempted certain record systems from the Privacy Act, including the Inmate Central Record System and the Inmate Physical and Mental Health Record System," id. at 21-22 (citing 28 C.F.R. § 16.97(a)(4-5)); and, in addition, (b) Plaintiff failed to meet each element needed for stating a viable Privacy Act claim.  See id. at 22-23 (relying on Skinner v. United States DOJ, 584 F.3d 1093 (D.C. Cir. 2009); Deters v. United States Parole Comm'n, 85 F.3d 655 (D.C. Cir. 1996); and Molerio v. FBI, 749 F.2d 815 (D.C. Cir. 1984)).  Being expressly put on notice about Defendants' aforesaid position, Plaintiff elected not to counter it in his opposition.  Defendants, thus, will be granted judgment in their favor without more, since this Court's recital of Defendants' persuasive thoughtful arguments would be wholly superfluous at this juncture.  Cf. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d at 533; English, 2007 U.S. App. LEXIS 4717, at *7.

### c.  Displeasure with the Mode of Interactions

Finally, Plaintiff made numerous passim references to his displeasure with the mode of interaction between the prison officials and Fort Dix inmates, since Plaintiff found that mode of interactions disrespectful.[45]

---

[45]  As already detailed supra, to the extent Plaintiff wished to raise claims on behalf of other inmates, he is without standing to raise these challenges.

While Defendants' motion fid not address this claim, its conclusive disposition is warranted here, since Plaintiff's allegations are facially insufficient.  The "Constitution does not confer upon an inmate the right to prison officers being polite and avoiding expletives, taunts, irritating laughter, cynical smiles, purely verbal threats, unflattering personal opinions, etc." Thomas v. Johnson, 2014 U.S. Dist. LEXIS 74396, at *21 (D.N.J. May 30, 2014); see also Dawson v. NJ State Trooper Barracks, 2011 U.S. Dist. LEXIS 92922 (D.N.J. Aug. 19, 2011) ("Plaintiff asserts not a constitutional deprivation but acts that might qualify only as ethically unpalatable.  . . .  [T]he Officers' conduct, . . . while not commendable, cannot reach the level of a violation of constitutional magnitude: 'the Constitution is not a manual of etiquette'") (quoting King v. Lienemann, 2011 U.S. Dist. LEXIS 21968, at *16 (S.D. Ill, Mar. 4, 2011); accord Shabazz v. Cole, 69 F. Supp. 2d 177, 200-01 (D. Mass. 1999) (collecting cases and pointing out that verbal harassment or verbal threats cannot violate inmate's rights). Thus, Plaintiff's claim will be dismissed with prejudice.

## C.   **Failure to Exhaust Administrative Remedies**

In addition to their substantive arguments, Defendants also raised an affirmative defense based on Plaintiff's failure to exhaust his claims prior to commencement of the instant matter.

While the framework of Defendants' position is legally correct, at this juncture, it cannot alter this Court's analysis and, therefore, does not supply a basis for a blanket dismissal of Plaintiff's claims.

    1.   The Exhaustion Requirement

"The Prison Litigation Reform Act ('PLRA') prohibits an inmate from bringing a civil rights suit alleging specific acts of unconstitutional conduct by prison officials until such administrative remedies as are available are exhausted . . . [and to] satisfy this requirement, a prisoner must exhaust all available administrative remedies prior to filing suit, including a Bivens action." Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (internal citations and quotations omitted); see also 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted"); accord Woodford v. Ngo, 548 U.S. 81, 88 (2006) ("[A] prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court"); Concepcion v. Morton, 306 F.3d 1347, 1348-49 (3d Cir. 2002) (same).  Consequently, if a prisoner files suit before he fully exhausts his administrative remedies,

the Court must dismiss his complaint, since exhaustion after the filing of a lawsuit does not and cannot cure any initial defect. See Ahmed v. Dragovich, 297 F.3d 201, 209 n.9 (3d Cir. 2002); Roscoe v. Dobson, 248 F. App'x 440, 442 (3d Cir. 2007); Oriakhi, 165 F. App'x at 993 ("The fact that [the inmate] completed the administrative review process before the District Court reached the exhaustion question is of no consequence.  Indeed, there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court").  That said, a dismissal rooted in procedural default is non-prejudicial and enables immediate re-filing once the administrative process is completed.[46]  See Ahmed, 297 F.3d 201, 207 (3d Cir. 2002) ("Ordinarily, an order dismissing a complaint without prejudice is not a final order as long as the plaintiff may cure the deficiency and refile the complaint").  Moreover, if the inmate alleges in his amended pleading or post-

---

[46]   Short of an assessment of another filing fee, such dismissal has minimal, if any, effect on the inmate's ability to re-raise his claims once the exhaustion is completed since such dismissal does not result in a "strike" for the purposes of a three-strikes rule.  See Ball v. Famiglio, 726 F.3d 448, 459 (3d Cir. 2013) ("[D]ismissal based on a prisoner's failure to exhaust administrative remedies does not constitute a PLRA strike, unless a court explicitly and correctly concludes that the complaint reveals the exhaustion defense on its face and the court then dismisses the unexhausted complaint for failure to state a claim").

pleading submissions that prison official somehow thwarted his ability to exhaust his administrative remedies, those remedies are not considered available within the meaning of § 1997e, and the exhaustion requirement is excused.  See Spada v. Martinez, 2014 U.S. App. LEXIS 15805, at *6-7 (3d Cir. Aug. 18, 2014) (citing Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002)).

Here, Plaintiff's allegations, as numerous as they are voluminous, were injected into this matter from two sources, one being Plaintiff's many filings made after his initial pleading (i.e., his affidavits, follow-up-statements, motions, amended complaints, memoranda, notices, letters, etc.), and the other being this Court's order directing consolidation of this matter with Plaintiff's later-commenced action, Visintine-II, Civil Action No. 11-4927.[47]

Moreover, unlike Plaintiff's outright silence in opposition to Defendants' motion reflecting on his conspiracy and Privacy Act claims, Plaintiff's submissions do suggest the presence of

---

[47]  Since Visintine-II was commenced by Plaintiff without submission of his filing fee or in forma pauperis application, see Visintine-II, Civil Action No. 11-4927, Docket Entry No. 1, his Visintine-II complaint was deemed "received" on the date of its submission and became "filed" only upon this Court's entry of the consolidation order, since only such consolidation granted Plaintiff in forma pauperis status for the purposes of his Visintine-II claims.  See Banda v. Otino, 2009 U.S. Dist. LEXIS 78677, at *32 (D.N.J. Sept. 1, 2009).  Thus, it could be argued that Plaintiff's Visintine-II claims, overlapping with some of his claims raised in the instant matter, became "filed" only upon the September 9, 2011, entry of the consolidation order.

allegations that challenge the availability of administrative review.  Cf. Small v. Camden County, 728 F.3d 265, 273-74 (3d Cir. 2013).  In light of these challenges, albeit scattered, and noting that many aspects of Plaintiff's claims raised in this action were also re-raised in Visintine-II (and, thus, filed after the case at bar was instituted), this Court finds a blanket dismissal based solely on the exhaustion grounds inappropriate. Rather, Defendants' exhaustion argument and supporting record provide this Court with an additional basis for dismissal of those Plaintiff's claims that warrant summary judgment in Defendants' favor on the merits.[48]  See Defreitas v. Montgomery County Corr. Facility, 525 F. App'x 170, 2013 U.S. App. LEXIS 9245 (3d Cir. 2013) (affirming such alternative-bases dismissal); accord Small, 728 F.3d at 269-72 (exhaustion issue is resolved by the presiding tribunal in its capacity of a fact finder).

D.  **Summary of Findings as to Fort Dix Claims**

In light of the multitude of Plaintiff's challenges that derived from his confinement in Fort Dix and were raised in the instant matter and Visintine-II, this Court finds it warranted to

_____

[48]  Thus, as to the surviving claims, the defendants whom Plaintiff identifies would be entitled to summary judgment on the grounds of exhaustion if: (a) these defendants provide the Court with a clear record showing that Plaintiff completed his exhaustion of administrative remedies with regard to these surviving claims after September 9, 2011 (or that he did not exhaust those claims at all); and (b) Plaintiff fails to assert a material fact placing that record in dispute.

provide the parties with a summary of its findings and guidance
as to litigation of Plaintiff's two claims that survive
Defendants' motion.

Plaintiff's claims asserting denial of medical care will be
dismissed as to the Fort Dix Warden, Boyce and Kaough.
Plaintiff's claim alleging denial of his request to have his
mental health pills dispensed to him in accordance with his
preferences will be construed as raised against unspecified Fort
Dix medical staff and dismissed.  Plaintiff's claims alleging
that his Percocet prescription was unduly changed to Tylenol with
codeine, or that he was not treated for two gastrointestinal
disorders, or that he was denied treatment for his orbital
fractures, or that he was denied removal of stitches will all be
dismissed.

Plaintiff's claim alleging concerns with the possibility of
contracting bacteria/viruses and his claim expressing displeasure
with the fact that Fort Dix inmates occasionally waited up to
four hours for their appointments will also be dismissed.  By the
same token, Plaintiff's claims alleging denial of due process
with regard to his disciplinary proceeding, transfer to a medium-
security facility, change in his classification and loss of
Plaintiff's employ at Fort Dix will be dismissed.  Furthermore,
Plaintiff's claims asserting depreciation of Fort Dix facilities,
their poor upkeep, overcrowding and violence among the inmates

will also be dismissed.  In addition, Plaintiff's allegations expressing his displeasure with the mode of interactions between the officers and inmates will be dismissed.

Plaintiff's Privacy Act challenges will also be dismissed, and Plaintiff's allegations of conspiracy between the warden and unspecified individuals, or between Boyce and Kaough will also be dismissed.  Defendants' affirmative defense based on Plaintiff's failure to exhaust his administrative remedies will be noted as an alternative basis for dismissal of all above-listed claims.

Defendants' motion will be denied as to Plaintiff's allegations that his mental health medications were expressly prescribed to him by a medical professional for consumption at 8:00 p.m. or later because the timing of consumption had a medically significant effect on the effectiveness of the pills. Plaintiff will be directed to file an affidavit detailing the facts of such prescription, if it was actually issued, naming the Fort Dix officials whom Plaintiff expressly informed of that prescription and who denied Plaintiff's request for having his pills dispensed to him in accordance with such prescription.

Defendants' motion will also be denied as to Plaintiff's claim of an unspecified exposure to second-hand smoking. Plaintiff will be directed to file an affidavit detailing the amounts, frequency and sources of such exposure, that is, in the event said exposure took place and was sufficiently substantial,

and naming the Fort Dix officials to whom Plaintiff expressly complained about that exposure and who denied Plaintiff's request for protection from such exposure.[49]

In the event Plaintiff files such affidavits, Defendants named in those affidavits will be allowed to move for summary judgment upon showing that Plaintiff's statements are unsupported or contradicted by the prison record and/or that these claims were not properly exhausted administratively by the time his Visintine-II claims were consolidated with the instant matter.[50]

## VII. CLAIMS RELATED TO CONFINEMENT AT FAIRTON

As noted supra, during the course of this litigation, Plaintiff has injected numerous claims based on his Fairton confinement into the instant matter, even though his original challenges were based exclusively on his confinement at Fort Dix. Under Rules 18 and 20, Plaintiff's claims based on the events that transpired during his Fairton confinement will be severed

---

[49] Plaintiff is reminded that his affidavit shall assert specific facts, not conclusions paraphrased as facts. See Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d at 533. Moreover, Plaintiff is cautioned not to construe the opportunity to file his affidavit as an invitation to raise new or different claims or as an opportunity to re-litigate the claims dismissed here.

[50] In accordance with the Federal Rules of Civil Procedure, Plaintiff will be provided with an opportunity to oppose such motions for summary judgment, if filed, and the named defendants will be given an opportunity to reply to Plaintiff's opposition in the event it is submitted.

into their own, new and separate, matter.  See <u>supra</u>, this Opinion, Part II.

However, in the interests of judicial economy and taking notice of this three-year long litigation, this Court finds it warranted to review Plaintiff's injected claims so to ensure that litigation of such new matter, if undertaken, would not be a futile exercise and waste of this Court's and parties' resources.

**A.   <u>Standard of Review</u>**

Since Plaintiff's Fairton-based allegations have never been screened, this Court will examine them under the Rule 8 standard, as clarified in <u>Iqbal</u>, 556 U.S. at 684; <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007); <u>Twombly</u>, 550 U.S. 544 (2007); and <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) ("<u>Iqbal</u> provides the final nail-in-the-coffin for the 'no set of facts' standard that applied . . . before <u>Twombly</u>").

The Court of Appeals directed the district courts to apply a two-part analysis in reviewing all civil claims.  First, the court must accept all of the complaint's well-pleaded facts as true, but should disregard any legal conclusions.  <u>See</u> <u>Fowler</u>, 578 F.3d at 210.  Then, the district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Phillips</u>, 515 F.3d at 234.

> [Where] the District Court . . . conclude[s] that [the
> plaintiff's] filings [are] inadequate, . . . [leave to
> amend] must be granted in the absence of . . . futility
> of amendment.  [See] Foman v. Davis, 371 U.S. 178, 182
> (1962); In re Burlington Coat Factory Sec. Litig., 114
> F.3d 1410, 1434 (3d Cir. 1997).

Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

**B.    Claims Unrelated to Medical Care**

Here, Plaintiff raised four challenges unrelated to medical
care.  Specifically, he asserted: (a) that Fairton inmates were
provided with "inadequate laundry services"; (b) that Fairton
facilities contained washers and dryers that allowed inmates
private laundry services upon a payment; (c) that Fairton was
housing almost twice the amount of inmates it was designed to
house; and (d) that the Fairton inmates were obligated to use
pre-printed "sender's address" labels on their outgoing mail.

**1.    Facially Meritless Claims**

The last three of the four above-listed claims are facially
meritless and not amenable to cure by re-pleading.  Therefore,
they will be dismissed with prejudice.

**a.   Overcrowding**

Plaintiff's overcrowding challenge as to Fairton mimics his
challenge with regard to Fort Dix, except that as to Fairton he
alleges that the facility houses twice, rather than thrice, the
amount of inmates it was designed to house.  Even if this claim
were true, a bare fact of overcrowding or double-banking cannot

71

support a claim of constitutional magnitude, be it with regard to
Fort Dix or Fairton, or any other facility.  See Hubbard, 538
F.3d at 236; North, 152 F. App'x at 113.  Since Plaintiff's
amended pleadings, voluminous affidavits, numerous follow-up
statements and other filings made in this matter have failed to
assert any fact suggesting that Plaintiff suffered a cognizable
injury as a result of the alleged overcrowding at Fairton,
allowing Plaintiff another opportunity to amend this line of
claims would be futile.  See Grayson, 293 F.3d at 108; accord
Minerals Dev. & Supply Co. v. Hunton & Williams, LLP, 2011 U.S.
Dist. LEXIS 113814, at *23 (W.D. Wis. Sept. 30, 2011) ("no need
to give . . . another bite of any apple that has already been
chewed to the core").

> b.   Paid Use of Appliances

Plaintiff asserts that his rights were violated because the
Fairton facilities offered inmates supplemental private laundry
services by installing commercial appliances that could be used
upon a payment, much like in a private civilian laundromat.

Such allegations fail to state a viable claim.

The [prison system] maintains bank accounts for the
inmates incarcerated in its facilities.  Inmates use
the funds in these accounts to cover the costs of
certain goods and services they purchase during their
time of incarceration.  The [prison system is obligated
to] provide[] for *the most basic needs* of the inmates —
such as food and shelter — without charge to the
inmates' accounts.  Inmates [however,] *must pay for
access to additional products and services* . . . .  For

> example, inmates must purchase items such as soap,
> deodorant, toothpaste, and over-the-counter
> medications.  Inmates are also responsible for medical
> co-pays and the cost of access to legal services . . .
> .  Inmates accrue money in their accounts through wages
> . . . for work conducted for the prison system or
> through gifts from friends and family.

Montanez v. Sec'y Pa. Dep't of Corr., __ F.3d __, 2014 U.S. App.

LEXIS 15602, at *2 (3d Cir. Aug. 14, 2014) (emphasis supplied).[51]

If a correctional facility offers inmates access to services

covering more than their most basic needs, those inmates who

cannot afford or decline to purchase those services cannot suffer

a violation of their constitutional rights.  See id.; see also

McClung v. Camp Cty, 627 F. Supp. 528 (E.D. Tex. 1986) (where bed

linens and basic laundry services "were available to the

prisoners and[,] . . . if a prisoner did not like what was

available, he could procure his own supplies from family and/or

friends," the prisoner's Eighth Amendment rights were not

_____

[51]  The Inmate Information Handbook detailing the services
provided to the Fairton inmates states, in relevant part: "At
Fairton, all issued clothing, linen, towels, etc., may be taken
to the Laundry for washing.  . . .  Dirty laundry must be
exchanged during Clothing Room hours.  The clothing will be
washed and available the next working day.  . . .  Exchange of
sheets and pillow cases will occur during the same hours. . . .
The Housing Units will [also] have washers and dryers available
for inmate personal property items."  See http://www.bop.gov/
locations/institutions/fai/FAI_aohandbook.pdf.  Thus, all bedding
and daily linens supplied by Fairton, as well as all prison-
distributed clothing, are laundered free of charge, and the paid/
commercial laundry services are offered to those inmates who wish
– and have the funds – to laundry their personal items, e.g.,
clothes purchased from stores rather than provided by Fairton.

violated).  Thus, Plaintiff's allegations based on the
availability of private washers and dryers are without merit.[52]

c.   Pre-printed "Sender's Address" Labels

Plaintiff's claim based on the fact that Fairton inmates had
to use pre-printed "sender's address" labels on their outgoing
mail is ambiguous at best, since it leaves this Court guessing
whether Plaintiff aimed to assert that his First Amendment rights
were violated because he could not send his mailings anonymously,
i.e., without *any* sender's address, or if he was preferring to
handwrite his address (either in full or with some omissions in
his prisoner's information that he perceived as unpalatable).
Regardless of the ambiguity of Plaintiff's challenge, it is
subject to dismissal for failure to state a viable claim.

Prisoners have a limited liberty interest in their mail
under the First Amendment, see Thornburgh v. Abbott, 490 U.S.
401, 407 (1989), that may be restricted through regulations
reasonably related to a legitimate penological interest.  See
Turner v. Safley, 482 U.S. 78, 89-91 (1987); see also Pell v.
Procunier, 417 U.S. 817, 822 (1974) ("In the First Amendment
context, . . . a prison inmate retains those First Amendment
rights that are not inconsistent with his status as a prisoner or

_____

[52]  Since the deficiency of this claim cannot be cured by
repleading, granting Plaintiff leave to amend would be futile.
See Foman, 371 U.S. at 182; Grayson, 293 F.3d at 108.

with the legitimate penological objectives of the corrections system"). Thus, prison officials are granted broad discretionary authority as the "operation of a correctional institution" since this task "is at best an extraordinarily difficult undertaking." Wolff v. McDonnell, 418 U.S. 539, 566 (1974). They are accorded wide-ranging deference in the adoption and execution of policies and practices needed to preserve internal order and institutional security. See Beard v. Banks, 548 U.S. 521 (2006); Bell v. Wolfish, 441 U.S. 520, 527 (1979); accord Boyer v. Taylor, 2008 U.S. Dist. LEXIS 24920, at *5 (D. Del. Mar. 28, 2008) ("The federal courts are not overseers of the day-to-day management of prisons, and [they] will not interfere in [a] determination [on the issue addressing] security concerns at the institution").

Here, Plaintiff's displeasure with the fact that Fairton inmates had to use pre-printed "sender's address" labels on their outgoing mail offers a challenge not warranting this Court's interference. Fairton officials have a legitimate penological interest, firmly grounded in security concerns, to ensure against inmates mailing anonymous letters or packages (or letters and packages containing incomplete, incorrect or otherwise deceiving "sender's address"). Cf. Turner, 482 U.S. at 84 (upholding a prison policy that restricted the exchange of mail between inmates in different institutions if the inmates were not family members); Jones v. North Carolina Prisoners' Union, 433 U.S. 119,

130 (1977) (since prisoners' rights were "barely implicated" by the prohibition on bulk mailings promoting prisoners' "unionization," the regulation barring such mailing was reasonable in light of the prison's penological concerns).[53]

Furthermore, nothing in the First Amendment vests Plaintiff with the right to have his sender's address handwritten rather than typed/pre-printed, and Fairton officials have a legitimate penological interest in ensuring uniformity and legibility of the "senders' addresses" since that goal enables Fairton to swiftly process or properly monitor its outgoing mail. Thus, Plaintiff's claim based on the need to use pre-printed "sender's address" labels is facially deficient. Being not amenable to cure by repleading, it will be dismissed with prejudice. See Foman, 371 U.S. at 182; Grayson, 293 F.3d at 108.

### 2.   Insufficiently Pled Claim

The foregoing leaves this Court with only one claim related to Plaintiff's confinement at Fairton but not asserting denial of medical care. That claim is reduced to a bold, conclusory statement that Fairton laundry services were "inadequate."

---

[53]   Fairton officials also have a legitimate penological basis (grounded in security concerns and in ensuring proper access to the courts) to impose the requirement that inmates state their *full and correct* addresses on their mailings, since mislabeled mailings might prevent proper delivery of their communications to the courts (and the courts' responsive mailings to the inmates).

So pled, this claim is facially deficient, since Rule 8 obligates the litigants to plead facts rather than self-serving conclusions. See Fowler, 578 F.3d at 210.  Moreover, this claim is also deficient in two other respects.  First, all Plaintiff's allegations related to Fairton were raised in the instant matter that named the Fort Dix warden, Boyce and Kaough as Defendants (i.e., persons that cannot be sued on the basis of the events they were not involved in, see supra, this Opinion, note 21), and the content of Plaintiff's filings made passim references solely to the Fairton warden, who: (a) was not named as a Defendant in this matter; and (b) cannot be liable on the basis of the alleged "inadequacy" of laundry services.[54]

Second, Plaintiff's statement that Fairton laundry services were "inadequate" strongly cautions this Court to the possibility that the facts underlying Plaintiff's challenges are unlikely to amount to a violation of constitutional magnitude.  As already

---

[54] Plaintiff's references to the warden in connection with the alleged "inadequacy" of Fairton laundry services were based on the warden's official capacity as the chief administrator of Fairton.  However, such claims are necessarily deficient under Iqbal: for the discussed-supra reasons identical to those causing this Court's dismissal of Plaintiff's claims raised against the Fort Dix warden.  See Part IV of this Opinion; accord Howard v. Adkison, 887 F.2d 134 (8th Cir. 1989) (where an inmate alleged that he was denied laundry services, the court upheld the judgment against the lieutenant who supervised the inmate's housing unit and the special unit manager, but set aside the verdict against the warden because the warden was not personally involved in the prison's laundry).

explained supra, in order to state a viable claim, Plaintiff must assert facts showing that the deficiencies in Fairton laundry services were so dire that they deprived Plaintiff of "the minimal civilized measure of life's necessities," Rhodes, 452 U.S. at 347-48, see also Young, 960 F.2d at 364, i.e., he must show that: (a) the deprivation was sufficiently serious, see Hudson, 503 U.S. at 9; and (b) the defendant personally implicated in the alleged defects of laundry services acted with "deliberate indifference," i.e., with a state of mind equivalent to a reckless disregard of a known risk of harm to Plaintiff. See Farmer v. Brennan, 511 U.S. 825, 835 (1994).

While it is conceivable that a prison's laundry services might be so deficient that they amount to a violation of constitutional magnitude, such deficiency cannot be grounder in a garden-variety "inadequacy." See, e.g., Howard, 887 F.2d at 137 (a constitutional violation was present where "[an inmate's] mattress was torn, dirty, stained with urine, and covered with human waste. . . . [A] new mattress was not provided [to him] for ten months. [To add, the inmate] was denied laundry service during his first five months . . . on the pretext that he did not possess a laundry bag. [His] repeated requests for a laundry bag during that period went unanswered. When laundry service was finally commenced, [his] laundry was returned wet and still dirty. Finally, [he] was provided with only a dirty blanket and

half a sheet"); compare Shannon v. Graves, 257 F.3d 1164 (10th
Cir. 2001) (where, "[if] there is a sewage overflow, [inmates']
blankets are used to mop up the sewage [and] then '[the blankets
are] sent out [for regular laundry], given no special cleaning,
and issued to the inmates while they still smell,' [and the]
inmates['] clothes are [washed together with those blankets and,
when the clothes are] returned from the laundry and rinsed,
'brown water comes out, plus they stink,'" the inmates' rights
were not violated by such poor laundry services because all
"items '[were] washed in commercial washing machines using clean
water, detergent, and bleach and then dried in commercial air
dryers," and – since nothing in the record indicated that prison
officials were aware of the condition of the blankets and clothes
– the inmate had not made a showing of deliberate indifference).

Here, both Plaintiff's resort to the adjective "inadequate"
and this Court's inability to locate in the record accrued over
these three years any Plaintiff's grievance informing Fairton
officers of a defects in their laundry services, renders it
questionable whether Plaintiff's challenges would meet both
prongs of the Eighth Amendment test. However, out of an
abundance of caution, this Court will allow Plaintiff an
opportunity to replead this claim with the required degree of

specificity, <u>i.e.</u>, without resorting to conclusory or bold statements expressing merely Plaintiff's displeasure.[55]

### C. **Claim Related to Medical Care**

In addition to the claims based on his Fairton confinement but unrelated to his medical care, Plaintiff also injected into this matter a two-part claim hinting at his interest to allege denial of medical care. Much like his "inadequate" laundry services claim, that two-part challenge was packaged into a bold, conclusory allegation that the Fairton warden violated Plaintiff's rights by denying Plaintiff "medical treatment for [an unspecified] knee injury and [in addition, denying Plaintiff medical treatment for unspecified] skin sores" that might or might not have been related to the alleged knee injury.

So pled, Plaintiff's challenge is insufficient substantively and as applied to the Fairton warden or any other Fairton officer. To start, depending on its specifics, a "knee injury" may or may not qualify as a "serious medical need" for the purposes of the Eighth Amendment analysis. <u>Compare</u> <u>Thomas v.</u>

---

[55] Toward that end, this Court will direct the Clerk to commence a new and separate § 1983 matter and allow Plaintiff an opportunity to file an amended pleading stating, clearly and concisely, the facts of his claim, <u>i.e.</u>, detailing the exact defects in laundry services Plaintiff suffered, as well as the frequency of such defects. In addition, Plaintiff will be directed to identify the defendants responsible for the alleged defects and state his facts plausibly showing that these identified defendants acted with deliberate indifference to the risk of harm to Plaintiff when they performed laundry services.

Talley, 2013 U.S. Dist. LEXIS 81294, at *32 (N.D. Ala. May 13,
2013) (a ligament damage presented a serious medical need); and
Poque v. Igbinosa, 2012 U.S. Dist. LEXIS 23150, at *20 (E.D. Cal.
Feb. 22, 2012) (same, as to a torn meniscus), to Mines v. Levi,
2009 U.S. Dist. LEXIS 26600, at *27 (E.D. Pa. Mar. 26, 2009)
(swollen and stiff knee was not a serious medical need where
x-rays came out negative); and Price v. Engert, 589 F. Supp.2d
240 (W.D.N.Y. 2008) (no serious medical need existed where x-rays
reveal no fracture to knee, even if the knee was swollen).

   Analogously, depending on their specifics, "skin sores" may
or may not qualify as a "serious medical need" under the Eighth
Amendment, since the answer to the objective-prong test is highly
fact-sensitive and determined on a case-by-case basis.  Compare
Walker v. Cal. Dep't of Corr. & Rehab., 2011 U.S. Dist. LEXIS
132804, at *9-10 (E.D. Cal. 2011) ("Plaintiff has sufficiently
shown a serious medical need, [since] she suffered from eczema,
with open sores and rashes developing all over her body, causing
pain, unbearable itching, and elevated blood pressure"), to
McKeithan v. Beard, 322 F. App'x 194, 198 (3d Cir. 2009)
("Although mere 'dry skin' [caused by eczema] may fall short of a
serious medical condition," skin that "was so cracked and dry
from [t]his condition that it bled" amounted to a serious medical
need), to Freeman v. Dep't of Corr., 2011 U.S. Dist. LEXIS 34551,
at *34-35 (M.D. Pa. Mar. 31, 2011) (generally, minor abrasions

81

and soreness cannot constitute a serious medical need), to <u>Turner
v. Unknown Parties</u>, 2012 U.S. Dist. LEXIS 16674, at *23 (W.D.
Mich. Feb. 9, 2012) (a mere "red mark on one's skin is not, in
itself, an obviously serious condition" meeting the objective
prong of the Eighth Amendment).  Therefore, Plaintiff's
allegations will be dismissed with a directive to specify the
exact knee injury and skin sores he allegedly suffered.

In addition, since Plaintiff did not identify which Fairton
officer or medical staff was notified of his alleged injuries and
what were the responses (and treatments) Plaintiff obtained, his
allegations fail to meet the subjective prong test.  Therefore,
Plaintiff's claims will be dismissed without prejudice, and he
will be directed to identify, as defendants, those individuals
whom he notified about his "knee injury" and "skin sores" and
who, allegedly, denied him medical treatment.[56]

> **D.   <u>Summary of Findings as to Fairton Claims</u>**

As with Plaintiff's challenges based on his confinement at
Fort Dix, this Court finds it warranted to provide the parties
with a summary of its findings related to Fairon confinement and

---

[56]  Only in the event such denial was a blanket denial,
<u>i.e.</u>, Plaintiff was provided with no treatment whatsoever
regardless of his medical complaints and, in addition, Plaintiff
notified the Fairton warden of his medical needs and of such
absolute denial of medical care, Plaintiff may name the Fairton
warden as defendant.  <u>See Spruill</u>, 372 F.3d 218; <u>Nami</u>, 82 F.3d
63; <u>Durmer</u>, 991 F.2d 64.

with guidance with regard to litigation of Plaintiff's two claims that will be severed into their own matter.

Plaintiff's allegations as to overcrowding at Fairton will be dismissed with prejudice.  His allegations based on the availability of supplemental, paid laundry services, as well as his challenges based on the alleged requirement that all inmates had to use pre-printed "sender's address" labels on their outgoing mail, will be dismissed with prejudice.  Plaintiff's allegations that Fairton laundry services were "inadequate" and that he was denied medical care for his knee injury and skin sores will be severed into a new and separate matter.  Plaintiff will be directed to verify his willingness to assume financial responsibility for that matter and to replead his claims with the required degree of specificity, as detailed <u>supra</u>, by stating only his facts.[57]

---

[57] In the event Plaintiff is uncertain as to how to plead his claims, this Court offers him the guidance provided by the Court of Appeals, which observed that facts should be analogous to "the first paragraph of any newspaper story — that is, the 'who, what, when, where and how' of the events at issue."  <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 276-77 (3d Cir. 2006) (citations omitted).  Moreover, taking notice of Plaintiff's unfortunate tendency to exaggerate his facts and to resort to unwarranted analogies and name-calling, this Court stresses that "[Plaintiff's] 'poetic license' [statements] are not a basis for relief.  Simply put, dry facts stated in a clear and concise pleading speak volumes for the purposes of any legal proceeding, while eloquent poetic 'nothings' are invariably dismissed as pure rhetoric."  <u>Clauso v. Glover</u>, 2012 U.S. Dist. LEXIS 139205, at *21-22 (D.N.J. Sept. 26, 2012).  Thus, Plaintiff's references to any defendant as "Nazi" and to himself

Plaintiff, however, is reminded that he can neither inject additional claims into that new matter nor re-raise his challenges dismissed here.

## VIII. OVERALL CONCLUSIONS

For the foregoing reasons, Defendants' motion for summary judgment, Docket Entry No. 87, will be granted in part and denied in part.

With regard to Plaintiff's confinement at Fort Dix, Defendants' motion will be denied as to Plaintiff's claim asserting exposure to second-hand smoking and his claim alleging that his mental health medications were: (a) expressly prescribed to him by a medical professional for consumption at 8:00 p.m. or later because the timing of consumption had a medically significant effect on the effectiveness of the pills; but (b) denied to him for his consumption as prescribed.  Plaintiff will be directed to file affidavits detailing the facts of these claims and identifying the defendants personally involved in the alleged wrongs.  The so-named defendants will be allowed to move for summary judgment on the substantive and procedural bases.

---

as a "Jew in a death camp" are unacceptable and such references, as well as any analogous statement, shall not be included in his amended pleading.  Accord In re FleetBoston Fin. Corp. Sec. Litig., 2007 U.S. Dist. LEXIS 87425, at *64, n.24 (D.N.J. Nov. 28, 2007) (where one party's brief characterized the other's party's position as "a display of incredible chutzpha," the court gave the litigants "the Court's first and last notice that mutual courtesy and respect is expected and will be enforced").

Plaintiff will be allowed to oppose such motion, if filed, and the defendants will be allowed to reply.

Defendants' motion will be granted as to all other Plaintiff's claims based on his confinement at Fort Dix, as well as with regard to all Plaintiff's claims raised against the Fort Dix warden, Boyce and Kaough.  These claims will be dismissed with prejudice, and this matter will be administratively terminated subject to reopening in the event Plaintiff timely files his affidavits.  See Papotto v. Hartford Life & Accident Ins. Co., 731 F.3d 265 (3d Cir. 2013) ("administrative closings [are not final dismissals on the merits; rather, they] are a practical tool used by courts to prune overgrown dockets and are particularly useful in circumstances in which a case, though not dead, is likely to remain moribund").

In addition, Plaintiff's claims based on his Fairton confinement and asserting inadequate laundry services and denial of medical care to Plaintiff's knee and skin sores will be severed into their own, new and separate matter and dismissed without prejudice.  That matter will be administratively terminated, see id., subject to reopening in the event Plaintiff: (a) submits a written statement accepting his financial responsibility for that new matter; and (b) timely files his amended pleading detailing the facts of these two claims and identifying defendants personally involved in the alleged events.

85

All Plaintiff's other claims based on his Fairton
confinement will be dismissed with prejudice.

An appropriate Order follows.


s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: September 5, 2014